Opinion issued January 11, 2007

 

















In The

Court of Appeals

For The

First District of Texas






NOS. 01-05-00758-CV

 01-06-00497-CV

 __________


TEXAS SOUTHERN UNIVERSITY, Appellant


V.


STATE STREET BANK AND TRUST COMPANY,

CMS VIRON CORPORATION, AND

 CMS ENERGY RESOURCE MANAGEMENT COMPANY, Appellees






On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 2002-54422






OPINION ON REHEARING

 Texas Southern University, appellant, and State Street Bank and Trust
Company, appellee, both filed motions for rehearing. Having considered the motions
and responses, the Court finds the motions to be without merit. The Court, however,
withdraws its Opinion and judgment issued June 8, 2006 and issues the following in
its stead. 

 CMS Viron Corporation and CMS Energy Resource Management Company
(collectively "Viron") and State Street Bank and Trust Company asserted numerous
claims against one another and Texas Southern University ("TSU") arising from an
alleged contract between TSU and Viron. In this interlocutory appeal, TSU, a
political subdivision of the State of Texas, appeals the trial court's denial of its pleas
to the jurisdiction based on sovereign immunity. (1) 

 In four issues, TSU contends that (1) Viron has not obtained legislative
permission to sue TSU; (2) a party cannot circumvent the State's immunity from suit
by recasting a contract claim as one for inverse condemnation; (3) the Uniform
Declaratory Judgments Act does not expand the court's jurisdiction; and (4) Viron did
not possess a vested property right in the equipment and TSU acquired the equipment
pursuant to its contract with Viron, not through the exercise of eminent-domain
powers. We affirm in part and reverse and remand in part. 

I. FACTUAL (2) AND PROCEDURAL BACKGROUND


 In an attempt to lower its energy costs, TSU solicited bids for "comprehensive
energy conservation services," including "performing a comprehensive energy audit,
and to include energy and maintenance-related staffing requirements and an
evaluation of current staff qualifications," and "providing equipment and/or services,
including all financing, necessary to achieve long-term, cost-effective energy
efficiency, and reduce the University's operating costs." After soliciting bids for the
project, on January 16, 1998, TSU notified Viron that the TSU Board of Regents had
authorized "the award of a contract to Viron Energy Services for the referenced
project." As part of the energy audit, Viron submitted a proposed "Performance
Based Energy Savings Agreement" ("Energy Savings Agreement") to carry out the
corrective measures discussed in the energy audit. The Energy Savings Agreement
called for six projects for the improvement of TSU's physical plant for a total price
of $13,534,281. TSU agreed to pay $5,097,546 (3) in cash with the remaining
$8,334,281 to be funded by a lease between TSU and Viron. In July 1998, after a
meeting during which the Board of Regents authorized the TSU administration to
proceed with the Energy Savings Agreement, the Energy Savings Agreement was
executed by TSU's President, James M. Douglas, and James Mullaney of Viron.

 Academic Capital, L.L.C. offered to provide financing for the proposed
lease/purchase agreement. Academic Capital proposed that it would deposit
approximately $8.3 million in an escrow account to be established to fund the
purchase of the equipment necessary for the TSU project. From the escrow account,
Viron would be paid in four equal installments of $2,083,570.25. Academic Capital
designated its alter ego, Academic Services, as escrow agent under the escrow
agreement.

 In September 1998, Viron and TSU executed the Master State and Municipal
Lease/Purchase Agreement ("the Master Lease") wherein TSU requested that Viron
get the equipment. In the Master Lease, TSU certified that it had "the legal capacity
to enter into [the] Master Lease." TSU was to retain title to the equipment; however,
if TSU was in default, the title was to "re-vest immediately in and shall revert to
[Viron] free of any right, title or interest of TSU." 

 The rental payment schedule found in the Master Lease provided for 20
semiannual payments of $554,818.43 (4) for a total of $11,122,869.93. The first
payment was due on February 1, 2000 and the last payment on August 1, 2009. The
rental payment schedule was signed by Harold Johnson, associate vice president of
Facilities Planning and Operations for TSU. 

 An opinion letter from Cheryl Elliot Thornton, TSU's General Counsel, was
attached as an exhibit to the Master Lease. In that letter, Thornton stated:

 The Master Lease is a governmental purpose obligation and constitutes
a legal, valid and binding deferred payment obligation of [TSU],
enforceable in accordance with its terms and does not constitute a debt
of [TSU] under the laws of the State of Texas. In the event [Viron]
obtains judgment against [TSU] for money damages in connection with
the Master Lease, [TSU] will be obligated to pay such judgment. . . . 

 . . . .


 . . . The signature of the official of [TSU] which appears on the Master
Lease and the attached documents is true and genuine; I know him/her
to hold the office set forth below his/her name. Such official is duly
authorized to execute the Master Lease and the attached documents. I
have attached hereto a copy of such authorization. . . . 


 . . . .


 . . . This opinion may be relied upon by you and your assigns.


Viron, TSU, and Academic Services agreed that the previously-executed escrow
agreement would become part of the Master Lease. 

 Viron assigned to Academic Capital its benefits under the Master Lease, and 
TSU executed its acknowledgment of the assignment which included its
understanding that the payment schedule was unchanged. A few months later,
Academic Capital and Academic Services assigned the Master Lease, which included
the escrow agreement, to State Street Bank. Among the rights assigned were (1) all
rights as the owner and lessor of the equipment; (2) all right, title and interest in and
to the equipment; and (3) all right, title and interest in and to all payments to be made
by TSU in connection with the equipment. In return, State Street advanced
$8,547,545.51 into an acquisition fund to be used by Viron to finance the purchase
and the delivery of the equipment. The acquisition fund was to be administered by
Academic as an escrow account.

 On April 2, 1999, TSU sent Viron a "Notice to Proceed" with the Thermal
Plant Chiller Upgrade project. (5) Viron completed its work in March 2000. 

 As the project progressed, the first three required payments were made by
Academic Capital from State Street's escrow account to Viron as scheduled on
September 1, 1998; March 1, 1999; and September 1, 1999, each in the amount of
$2,083,570.25. Viron contends, however, that it never received the final payment it
was due. The payment was sent to State Street instead.

 The first payment to be made by TSU under the Master Lease was due on
February 1, 2000. At that time, TSU, via its new President and new General Counsel,
asserted that the Master Lease was not a valid obligation of TSU and refused to make
the payments. (6) Among other things, TSU maintained that the purported Master Lease
was void because the TSU representative had not been authorized by the TSU Board
of Regents, the Texas Higher Education Coordinating Board, or in accordance with
law, to enter into such an undertaking. When the first payment was due, Academic
Capital paid the installment to State Street out of the Viron's escrow account. State
Street contends that it was unaware that the money was not coming directly from
TSU. To date, TSU has not made any of the lease payments due under the terms of
the Master Lease, and the equipment remains on its campus.

 Viron informed the Texas Attorney General's office of TSU's outstanding
balance. TSU and Viron could not agree to everything; however, they did address
Viron's work on the thermal chiller plant system. TSU paid Viron the balance of
$5,100,000 due on that part of the project. (7)

 In the summer of 2001, State Street learned that TSU was not making the
required installment payments and also that the purported Master Lease "had not been
authorized by TSU's Board of Regents, or the Coordinating Board, or in accordance
with the law, and was therefore void and unenforceable." State Street notified TSU
and Viron that these actions constituted defaults of the purported Master Lease and
Viron was required to repurchase the purported Lease from State Street for the
$7,621,451.27 unpaid balance due to State Street. To date, it has not done so.

State Street's Claims (8)

 State Street's third amended petition asserted an inverse condemnation claim
against TSU and also sought the trial court's determination and declaration that (1)
the purported lease and all related documents "were executed without the requisite
authority" and are "void and unenforceable against TSU;" (2) TSU does not have any
rights to the equipment; (3) State Street holds all rights, title and interest to the
equipment; (4) TSU has "no right, title, or interest to the equipment and must return
the equipment to State Street;" and (5) State Street is entitled to a constructive trust
and return of the equipment to State Street. 

 In its plea to the jurisdiction, TSU argued that (1) State Street failed to allege
any waiver of TSU's immunity from suit; (2) characterizing a contract dispute as a
declaratory judgment claim does not confer jurisdiction on a trial court; (3)
declaratory judgment seeking to establish a contract's validity may not be maintained
without legislative permission; (4) State Street lacks standing to assert a claim for
inverse condemnation; (5) State Street had no ownership interest prior to the
assignment of the contract from Academic Capital to State Street; and (6) all of State
Street's alleged right, title, and interest flow from the contract. There was no sworn
denial of State Street's ownership. 

 Quintin Wiggins, TSU's Senior Vice President for Business and Finance, 
testified that the Master Lease was never valid, it was never authorized by the TSU
Board of Regents or the Higher Education Coordinating Board, TSU was not the
owner of the equipment, State Street had title to the equipment, and TSU had never
made any lease payments on the equipment. 

 The trial court denied the plea to the jurisdiction as to State Street's claims
without explanation. 

Viron's Claims (9)

 Viron's second amended counterclaim and third-party petition asserted
numerous causes of action against TSU including breach of contract (breach of the
Energy Audit Agreement, the Energy Savings Agreement, and the Master Lease), (10)
unjust enrichment, inverse condemnation, and indemnification in the event that State
Street recovered from Viron. Finally, Viron requested that the trial court make a
"determination and declaration that the Master Lease and all related documents
signed by any representative of TSU are valid, binding, and enforceable obligations
of TSU." 

 In its plea to the jurisdiction, TSU argued that (1) Viron failed to allege waiver
of TSU's immunity from suit in its contract causes of action; (2) Viron's declaratory
judgment suit fails because it is seeking to enforce performance under a contract and
is, thus, a suit against the State that cannot be maintained without legislative
permission; and (3) "Viron lacks standing to assert an inverse condemnation claim 
as it seeks to assert the claim on behalf of State Street." The trial court issued a
lengthy order denying TSU's plea. After recitation of the relevant factual allegations,
the trial court found that, "in light of the extraordinary factual circumstances
presented," the court could not conclude that TSU was "entitled to prevail" on its
pleas to the jurisdiction. The trial court further stated in response to TSU's argument
that Viron had no standing to assert a claim for inverse condemnation that, because
there was a fact question "as to what extent [Viron] currently has an ownership
interest in the equipment under the Master Lease . . . , it is inappropriate at this time
to deny the plea with prejudice as to the inverse condemnation claim." Finally, the
trial court acknowledged that "ambiguity exists as to whether and [to] what extent a
state agency can waive sovereign immunity by its conduct . . . . The [c]ourt, however,
is unaware of definitive case law that precludes application of waiver-by-conduct
doctrine to circumstances as potentially unique as those in this case."

 TSU appeals the trial court's denial of its pleas to the jurisdiction.

II. APPLICABLE LAW


A. The Sovereign Immunity Doctrine

 Texas has long recognized that sovereign immunity, unless waived, protects
the State of Texas, its agencies, and its officials from lawsuits for damages, absent
legislative consent to sue the State. Dir. of Dep't of Agric. & Env't v. Printing Indus.
Ass'n of Tex., 600 S.W.2d 264, 265 (Tex. 1980); Griffin v. Hawn, 341 S.W.2d 151,
152-53 (Tex. 1960); Hosner v. DeYoung, 1 Tex. 764, 769 (1847). Sovereign
immunity embraces two principles: immunity from suit and immunity from liability. 
Mo. Pac. R.R. Co. v. Brownsville Navigation Dist., 453 S.W.2d 812, 813 (Tex. 1970). 
Immunity from suit bars a suit against the State unless the Legislature expressly
consents to the suit. Tex. Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d
849, 853 (Tex. 2002). If the Legislature has not expressly waived immunity from
suit, the State retains such immunity even if its liability is not disputed. Fed. Sign v.
Tex. S. Univ., 951 S.W.2d 401, 405 (Tex. 1997). Immunity from liability protects the
State from money judgments even if the Legislature has expressly given consent to
sue. IT-Davy, 74 S.W.3d at 853. The bar of sovereign immunity is a creature of
common law and not of any legislative enactment. Tex. A&M Univ.-Kingsville v.
Lawson, 87 S.W.3d 518, 520 (Tex. 2002). 

 The Texas Supreme Court has long recognized that "it is the Legislature's sole
province to waive or abrogate sovereign immunity." Fed. Sign, 951 S.W.2d at 409. 
The Legislature may consent to suits against the State by statute or by resolution. 
Gen. Serv. Comm'n v. Little-Tex Insulation Co., 39 S.W.3d 591, 594 (Tex. 2001). 
The Legislature is better suited than the courts to weigh the conflicting public policies
associated with waiving immunity and exposing the government to increased liability,
the burden of which the general public must ultimately bear. IT-Davy, 74 S.W.3d at
854. 

 Legislative control over waiving immunity from suit does not mean that the
State can freely breach contracts with private parties or that the State can use
sovereign immunity as a shield to avoid paying for benefits the State accepts under
a contract. Id. Rather, if a party who contracts with the State feels aggrieved, it can
seek redress by asking the Legislature to waive immunity from suit. Id.; see Tex.
Civ. Prac. & Rem. Code Ann. §§107.001-.005 (Vernon 2005). 

 When the State contracts with a private party, it waives immunity from
liability. Little-Tex, 39 S.W.3d at 594. The State does not, however, waive immunity
from suit simply by contracting with a private party. Id. Immunity from suit bars a
suit against the State unless the State expressly gives its consent to the suit. Id.; see
also Tex. Civ. Prac. & Rem. Code Ann. §§ 101.025; 107.001-.005. Although the
claim asserted may be one on which the State acknowledges liability, this rule
precludes a remedy until the Legislature consents to suit. See Mo. Pac. R.R., 453
S.W.2d at 813. Legislative consent for suit or any other sovereign immunity waiver
must be "by clear and unambiguous language." Univ. of Tex. Med. Branch at
Galveston v. York, 871 S.W.2d 175, 177 (Tex. 1994); Duhart v. State, 610 S.W.2d
740, 742 (Tex. 1980).

 Immunity from liability protects the State from judgments even if the
Legislature has expressly given consent to the suit. Mo. Pac. R.R., 453 S.W.2d at
813. Even if the Legislature authorizes suit against the State, the question remains
whether the claim is one for which the State acknowledges liability. See State v.
Isbell, 94 S.W.2d 423, 425 (Tex. 1936). The State neither creates nor admits liability
by granting permission to be sued. Tex. Civ. Prac. & Rem. Code Ann. § 107.002
("A resolution granting permission to sue does not waive to any extent immunity from
liability."); Isbell, 94 S.W.2d at 424-25. However, when the State contracts, the
State is liable on contracts made for its benefit as if it were a private person. State v.
Elliott, 212 S.W. 695, 697-98 (Tex. Civ. App.--Galveston 1919, writ ref'd). 
Consequently, when the State contracts with private citizens, it waives immunity from
liability.

B. Plea to the Jurisdiction

 A plaintiff who sues the State must establish the State's consent to sue. Tex.
Dep't of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999). Otherwise, sovereign
immunity from suit defeats a trial court's subject-matter jurisdiction. Id. The State
may assert sovereign immunity from suit in a plea to the jurisdiction. Id. A plea to
the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of
subject-matter jurisdiction, thus defeating "a cause of action without regard to
whether the claims asserted have merit." Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d
547, 554 (Tex. 2000). Subject-matter jurisdiction is essential to the authority of a
court to decide a case. See Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928
(Tex. 1998). 

 In a suit against a governmental unit, the plaintiff must affirmatively
demonstrate the court's subject-matter jurisdiction by alleging a valid waiver of
immunity. Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540, 542 (Tex. 2003). 
To determine whether the plaintiff has met that burden, we consider the facts alleged
by the plaintiff and, to the extent it is relevant to the jurisdictional issue, the evidence
submitted by the parties. Id. (quoting White, 46 S.W.3d at 868). "[I]f the pleadings
affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may
be granted without allowing the plaintiff an opportunity to amend." County of
Cameron v. Brown, 80 S.W.3d 549, 555 (Tex. 2002). A plea to the jurisdiction must
be denied where the State contends that it is immune on the basis of a "contract
dispute" but where fact issues exist regarding the existence of a contract. State v.
Holland, 161 S.W.3d 227, 233 (Tex. App.--Corpus Christi 2005, pet. filed). Because
immunity from suit defeats a trial court's subject-matter jurisdiction, immunity from
suit may properly be asserted in a plea to the jurisdiction. See Tex. Dep't of Parks &
Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex. 2004).

 We review a trial court's ruling on a jurisdictional plea de novo, construing the
pleadings in the plaintiff's favor and looking to the pleader's intent. Id. at 226;
IT-Davy, 74 S.W.3d at 855. Whether the pleader has alleged facts that affirmatively
demonstrate subject-matter jurisdiction is a legal question that we review de novo. 
Miranda, 133 S.W.3d at 226. "If a plea to the jurisdiction challenges the existence
of jurisdictional facts, [a court is to] consider relevant evidence submitted by the
parties when necessary to resolve the jurisdictional issues raised." Id. at 227. Yet,
"[i]f the evidence creates a fact question regarding the jurisdictional issue, then the
trial court cannot grant the plea to the jurisdiction, and the fact issues will be resolved
by the fact finder." Id. at 227-28.

C. Declaratory Judgment Act

 The Uniform Declaratory Judgment Act ("DJA") is a remedial statute designed
"to settle and to afford relief from uncertainty and insecurity with respect to rights,
status, and other legal relations." Tex. Civ. Prac. & Rem. Code Ann. § 37.002(b)
(Vernon 1997); IT-Davy,74 S.W.3d at 855. The Act provides:

 A person interested under a deed, will, written contract, or other writings
constituting a contract or whose rights, status, or other legal relations are
affected by a statute, municipal ordinance, contract, or franchise may
have determined any question of construction or validity arising under
the instrument, statute, ordinance, contract, or franchise and obtain a
declaration of rights, status, or other legal relations thereunder.


Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon 1997). The DJA does not
extend a trial court's jurisdiction, and a litigant's request for declaratory relief does
not confer jurisdiction on a court or change a suit's underlying nature. IT-Davy, 74
S.W.3d at 855.

 Private parties may seek declaratory relief against state officials who allegedly
act without legal or statutory authority, but such suits are not "suits against the State." 
Id. (quoting W. D. Hayden Co. v. Dodgen, 308 S.W.2d 838, 840 (Tex. 1958)). This
is because suits to compel state officers to act within their official capacity do not
attempt to subject the State to liability. Id. In contrast, declaratory-judgment suits
against state officials seeking to establish a contract's validity, to enforce
performance under a contract, or to impose contractual liabilities are suits against the
State. Id. That is because such suits attempt to control state action by imposing
liability on the State. Id. at 856. Consequently, such suits cannot be maintained
without legislative permission. Id.; see also Fed. Sign, 951 S.W.2d at 404. Private
parties cannot circumvent the State's sovereign immunity from suit by characterizing
a suit for money damages, such as a contract dispute, as a declaratory-judgment claim. 
IT-Davy, 74 S.W.3d at 856; Freedman v. Univ. of Houston, 110 S.W.3d 504, 508
(Tex. App.--Houston [1st Dist.] 2003, no pet.).

D. Inverse Condemnation and Federal Takings Clause

 The Fifth Amendment states: "[N]or shall private property be taken for public
use, without just compensation." U.S. Const. amend. V. (11) The Texas Constitution
provides that, "No person's property shall be taken, damaged or destroyed for or
applied to public use without adequate compensation being made, unless by the
consent of such person . . . ." Tex. Const. art. I, § 17. Although sovereign immunity
generally protects the State from lawsuits for monetary damages, it offers no shield
against a taking claim brought under article 1, section 17 of the Texas Constitution. 
Steele v. City of Houston, 603 S.W.2d 786, 791 (Tex. 1980); see also Little-Tex, 39
S.W.3d at 594. 

 To have standing to sue for inverse condemnation, a party must have a property
interest at the time of the alleged taking. City of Keller v. Wilson, 168 S.W.3d 802,
808 (Tex. 2005); City of Houston v. Boyle, 148 S.W.3d 171, 178 (Tex.
App.--Houston [1st Dist.] 2004, no pet.). Not any property interest will do; that
interest must have risen to the level of a vested right. State/Operating Contractors
ABS Emissions, Inc. v. Operating Contractors/State, 985 S.W.2d 646, 651 (Tex.
App.--Austin 1999, pet. denied). A vested property right is one that has been fixed
by a court's final judgment or that has some definitive, rather than merely potential,
existence. Reiss v. Reiss, 40 S.W.3d 605, 608 (Tex. App.--Houston [1st Dist.] 2001),
rev'd on other grounds, 118 S.W.3d 439 (Tex. 2003). Standing is a constitutional
prerequisite to maintaining suit. See Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852
S.W.2d 440, 444 (Tex. 1993); Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984). 

 The State does not have the requisite intent under constitutional-takings
jurisprudence when it withholds property or money from an entity in a contract
dispute. Little-Tex, 39 S.W.3d at 598-99. Rather, the State is acting within a color
of right under the contract and not under its eminent domain powers. Id. at 599.

 To recover damages for inverse condemnation, State Street and Viron had to
prove that TSU intentionally took or damaged the equipment for public use, or were
substantially certain that would be the result. See Tex. Const. art. I, § 17; City of
Dallas v. Jennings, 142 S.W.3d 310, 313-14 (Tex. 2004). To defeat TSU's plea to
the jurisdiction, however, State Street need only plead sufficient facts to show the
elements of an inverse-condemnation cause of action. See Kerr v. Tex. Dep't of
Transp., 45 S.W.3d 248, 251 n.3 (Tex. App.--Houston [1st Dist.] 2001, no pet.).

 III. ANALYSIS


 TSU argues that, as a political subdivision of the State, it enjoys immunity from
Viron's and State Street's suits absent legislative consent. See Fed. Sign, 951 S.W.2d
at 408. In response, Viron offers three theories to support its contention that TSU
waived its sovereign immunity from suit. Specifically, Viron asserts that TSU's
immunity from suit was waived by: (1) TSU's accepting full contractual benefits
("waiver by conduct"), (2) inverse condemnation, and (3) legislative consent in the
Declaratory Judgment Act. Similarly, State Street offers two theories to support its
contention that TSU waived its sovereign immunity from suit by: (1) inverse
condemnation and (2) legislative consent in the Declaratory Judgment Act.

A. Waiver by Conduct

 In issue one, TSU argues that Viron has not obtained legislative permission to
sue TSU. It questions if sovereign immunity defeats subject-matter jurisdiction over
Viron's claims against TSU for breach of contract, unjust enrichment, indemnity, and
a declaratory judgment with respect to the validity of the contract between Viron and
TSU. In response, Viron argues that TSU has waived its sovereign immunity by its
conduct.

 1. Standing

 TSU argues that, "because Viron admittedly assigned all of its rights under the
Contract, . . . it lacks standing to sue TSU for breach of that Contract."

 Viron does not claim ownership of the equipment. Viron validly assigned all
its interest in the equipment in question to State Street Bank. Viron argues, however,
that, because TSU refuses to acknowledge that State Street ever acquired any interest
in the equipment by virtue of the assignment, Viron retains the breach of contract
claim.

 An oversimplification of the facts helps illuminate Viron's explanation of how
it "retains a genuine and substantial stake in this litigation."


 Viron and TSU entered into a contract;
 TSU has accepted the benefit of millions of dollars worth of equipment
under that contract;


 


 TSU has refused to pay the contracted price;


 


 Viron assigned its right to receive payments from TSU to State Street
Bank, which financed the deal;


 


 State Street sued TSU for defaulting on its payments;


 


 State Street also sued Viron for breach of warranty and indemnity on the
theory that Viron is financially liable for TSU's default;


 


 Viron sued TSU to protect itself from being forced to pay TSU's default;
 Viron faces a potential multi-million dollar loss in this case.


 This three-way litigation is plainly a situation in which a real controversy exists
between Viron and TSU which can be determined by monetary relief. Thus, it
satisfies the constitutional minimum for standing. See Texas Ass'n of Bus., 852
S.W.2d at 446 ("The general test for standing in Texas requires that there (a) shall be
a real controversy between the parties, which (b) will be actually determined by the
judicial declaration sought."). We hold that Viron has standing to asserts its contract
claims. See Miranda, 133 S.W.3d at 227-28.

 2. Supreme Court cases from Federal Sign to present

 In the seminal case, Federal Sign v. Texas Southern University, the Supreme
Court held that sovereign immunity bars breach-of-contract claims against the State
unless the claimant has obtained legislative consent to sue. Id. In Federal Sign, a
contract had been executed but it was terminated by TSU before performance. Id. at
403. Justice Baker's majority opinion cautioned that the holding was limited and
observed that "[t]here may be other circumstances where the State may waive its
immunity by conduct other than simply executing a contract so that it is not always
immune from suit when it contracts." Id. at 408 n.1 Writing for a plurality of four
justices, Justice Hecht concurred in Federal Sign and reinforced the significance of
the narrow holding of the Court by stating that "today's decision does not hold that
the State is always immune from suit for breach of contract absent legislative consent;
it holds only that the mere execution of a contract for goods and services, without
more, does not waive immunity from suit." Id. at 413 (Hecht, J., concurring). Justice
Hecht posed a series of hypotheticals that might support a waiver of sovereign
immunity:

 

 We do not address whether the State is immune from suit on debt
obligations, such as bonds.


 


 Would the result be different if Federal Sign had already installed the
scoreboards and TSU refused to pay the agreed price?



 

 Or if TSU had accepted the scoreboards, acknowledged that Federal
Sign had fully complied with the contract, but refused to pay the agreed
price?


 


 Or if TSU refused to pay in order to force Federal Sign to make a
concession on another contract?



Id. at 412 (Hecht, J., concurring). Justice Hecht recognized that the Federal Sign
opinion does "not attempt to decide such hypotheticals today." Id. (Hecht, J.,
concurring).

 In 2001, the Texas Supreme Court revisited the issue in General Services
Commission v. Little-Tex Insulation Co., 39 S.W.3d 591 (Tex. 2001). Justice Baker
wrote for the majority that held that the State does not waive immunity merely by
accepting benefits under a contract. Id. at 595-98. The Little-Tex case involved two
companion cases. One case involved a construction dispute in which the construction
had been completed, and the State, after paying the full contract price, refused to pay
a claim for adjustments. Id. at 599. The second case involved an asbestos abatement
contract that was terminated by the State, in the middle of performance, based on
disputes regarding the contractor's performance. Id. at 594. Neither case involved
a situation in which a contract had been fully performed and the State refused to pay
anything. In fact, neither of the cases addressed any of the hypotheticals previously
raised in Justice Hecht's concurrence to Federal Sign. After determining that the
cases fell within the newly-enacted administrative procedure found in Chapter 2260
of the Government Code, (12) the court concluded that "there is but one route to the
courthouse for breach-of-contract claims against the State, and that route is through
the Legislature." Id. at 597. Here, however, the trial court determined, and we agree,
that Chapter 2260 does not apply in this case. 

 The next year, the Texas Supreme Court again addressed the waiver-by-conduct exception to sovereign immunity in Texas Natural Resource Conservation
Commission v. IT-Davy, 74 S.W.3d 849 (Tex. 2002), and it was divided 4-4 on the
issue with one dissenting justice (Justice Enoch). In IT-Davy, the State had paid a
contractor the full contract price under the original terms, but it paid only a small
percentage of a claim for additional expenses and lost profits asserted under an
"equitable adjustment" clause. Id. at 851. Eight justices agreed that the facts did not
support a waiver-by-conduct exception, but were divided on the reasoning. Justice
Baker authored a plurality opinion urging a bright-line approach barring a waiver-by-conduct exception under any circumstances. Id. at 857. Justice Hecht authored a
concurrence for a plurality of four justices explaining why the facts in IT-Davy did
not rise to the level anticipated in his Federal Sign hypotheticals. Id. at 860-62. He
wrote, "My hypothetical supposed a government agency that chiseled a contractor just
because it could get away with doing so. Here, TNRCC and IT-Davy have a
legitimate disagreement over what price should be paid for the extra work. . . . This
is nothing more than an ordinary contract dispute." Id. at 861. The plurality
concurrence also stated that "I cannot join, however, in the broad language of Justice
Baker's opinion that indicates that the State is always immune from suit for breach
of contract absent legislative consent." Id. at 860. Justice Hecht concluded by stating
that "I cannot absolutely foreclose the possibility that the State may waive immunity
in some circumstances other than by statute." Id. at 862. 

 In Travis County v. Pelzel & Associates, 77 S.W.3d 246 (Tex. 2002), the
Supreme Court rejected another waiver-by-conduct assertion in a case involving a
construction contract. After the building was completed, Travis County paid virtually
the entire contract price of $414,164.80, but withheld $5,500 because the
performance was not timely, relying on a liquidated damages clause. Id. at 247. The
court found no waiver of immunity because the conduct at issue in that case did not
amount to a waiver. Id. at 252. The court held that "[w]hen a governmental unit
adjusts a contract price according to the contract's express terms, it does not, by its
conduct, waive immunity from suit, even if the propriety of that adjustment is
disputed." Id. Viron contends that this holding illustrates the Texas Supreme Court's
desire to impute a more "modest, case-by-case approach" when considering waiver-by-conduct.

 In Texas A&M University-Kingsville v. Lawson, Justice Hecht, writing for a 5-4
Court, adopted a waiver exception for immunity in breach-of-contract cases: When
the State settles a claim from which it is not immune, sovereign immunity does not
protect it from a breach-of-contract action to enforce the settlement agreement. 87
S.W.3d at 518. Lawson settled his Whistleblower Act case against the University, but
later sued the University alleging that it violated the terms of the settlement. Id. at
519. The court recognized that "a suit for breach of a settlement agreement is
separate and apart from the suit on the settled claim" and held that "enforcement of
a settlement of a liability for which immunity is waived should not be barred by
immunity." Id. at 521. In so holding, the court rejected both the court of appeals'
"adoption of a broad waiver-by-conduct exception to sovereign immunity" and
Justice Rodriguez's dissent's "rigid view of immunity from suit for breach of
contract." Id. at 522-23.

 The Court's latest decision on the subject can be found in Catalina
Development, Inc. v. County of El Paso, 121 S.W.3d 704, 704 (Tex. 2003), where a
county solicited bids for purchasing a parcel of land, accepted the highest bid,
deposited the tendered earnest money, and sent the purported buyer a warranty deed
and affidavit to be used to close the transaction. The county delayed authorization
to sign the deed, and a newly-elected commissioner's court refused to approve the
sale. Id. While repeatedly stating that the State may waive its immunity by conduct,
the court held "the equitable basis for such a waiver simply does not exist under this
set of facts." Id. at 705-06. The court distinguished the facts in Catalina from those
in Federal Sign by stating that "the County did not profit unfairly at Collins's
expense," and, despite the fact that he fully performed under the contract, Collins
"ignores an important distinction between [Justice Hecht's hypothetical in his
concurrence in] Federal Sign and this case. In Federal Sign, the State was the buyer
of commercial goods, while here the County is the seller of government land. Collins
does not seek to recover for goods already conveyed." Id. at 706. The Catalina
court, which consisted of eight justices and one dissenter (Justice Enoch), clearly
establishes that the court will evaluate the waiver-by-conduct exception to sovereign
immunity on the facts of each case, not as a categorical matter or bright-line rule. 
 3. Application to our facts

 The Texas Supreme Court has never addressed a waiver-by-conduct exception
argument faced with the "extraordinary factual circumstances" as the trial court
described them here. In its order denying TSU's plea to the jurisdiction against
Viron, the trial court listed the following eight "relevant factual allegations":

 1. On January 16, 1998, TSU notified [Viron] by letter that the TSU
Board of Regents had authorized the award of a contract to
[Viron] for the performance of an audit of TSU's energy system
(the "energy audit agreement"). The letter was signed by
Dannette McElroy-Davis, project manager, and Harold Johnson,
associate vice president of Facilities Planning and Operations for
TSU.


 2. On January 28, 1998, two TSU officials instructed [Viron] in a
written "Notice to Proceed" to commence work on the audit.


 3. On February 25, 1998, TSU General Counsel Cheryl Elliot
Thornton ("Thornton") notified a TSU official that the energy
audit agreement was "acceptable for final execution," subject to
some technical revisions.


 4. The energy audit agreement was executed by TSU President
James M. Douglas ("Douglas") on or about March 4, 1998.


 5. [Viron] completed the energy audit in June 1998.


 6. As a result of the audit's findings, [Viron] submitted a proposal
to TSU in which [Viron] offered to commence work on six
projects aimed at improving energy conservation and efficiency
on the TSU campus. The proposal, titled the Performance Based
Energy Savings agreement (the "PBES agreement"), called for
[Viron] to provide both services and equipment to TSU.


 7. At a meeting on July 10, 1998, the TSU Board of Regents
authorized the TSU administration to proceed with the PBES
agreement. President Douglas subsequently executed the PBES
agreement on behalf of TSU on July 27, 1998.


 8. Pursuant to the PBES agreement, [Viron] and TSU entered into
a Master State and Municipal Lease/Purchase Agreement (the
"Master Lease") [footnote omitted] in September 1998 to finance
the purchase of equipment needed to complete the energy
projects. In a letter attached to the Master Lease, TSU General
Counsel Thornton represented to [Viron] that the Master Lease
was "duly authorized by all necessary action on the party of the
Lessee (TSU)" and that the Master Lease was "legal, valid, and
binding" and "enforceable in accordance with its terms."


Viron alleges that, after it provided approximately $13 million in equipment and
services, TSU declared that the agreements in question were not valid obligations and
refused to make payments due. Quintin Wiggins, TSU's corporate representative,
testified that TSU did not make any lease payments on the equipment it received from
the Master Lease. Viron contends that these facts alone are enough to create a
waiver-by-conduct exception. It argues, however, that 

 the injustice is even worse, because this case also includes an additional
fact that appears in none of the prior cases: The government officials
lured Viron into the Master Lease with false promises that the contract
would be valid and enforceable, then disclaimed any obligation on the
contract by taking the position that the contract was not valid after all. 


We agree. Based on the facts before us, we overrule point of error one and hold that
sovereign immunity does not defeat the trial court's subject-matter jurisdiction over 
Viron's claims for breach of contract.

B. Waiver by the DJA

 In issue three, TSU contends that the DJA does not expand courts' jurisdiction,
and the declaration that State Street seeks concerns the validity of a contract with the
State. TSU questions whether the trial court lacks jurisdiction to make this
declaration.

 State Street sought the trial court's determination and declaration that (1) the
purported Master Lease and all related documents "were executed without the
requisite authority" and are "void and unenforceable against TSU"; (2) TSU does not
have any rights to the equipment; (3) State Street holds all rights, title and interest to
the equipment; (4) TSU has "no right, title, or interest to the equipment and must
return the equipment to State Street"; and (5) State Street is entitled to a constructive
trust and return of the equipment to State Street. State Street's declaratory judgment
action against TSU affirmatively pleads that its dispute with TSU is not based on a
contract. State Street argues that TSU cannot contest its ownership because TSU
failed to controvert ownership by verified denial as required by Texas Rule of Civil
Procedure 93, which states that a pleading that a "plaintiff is not entitled to recover
in the capacity in which he sues" is required to "be verified by affidavit." Tex. R.
Civ. P. 93(2). (13) State Street further contends that TSU cannot contest State Street's
allegation that there is no contract between the parties because TSU failed to
controvert, by verified denial as required by rule 93, State Street's express pleading
that the Master Lease was void ab initio. (14) 

 TSU argues that IT-Davy conclusively bars Viron's declaratory-judgment
claim, which requests a declaration that the contract is valid and State Street's
declaratory judgment claim, which seeks a declaration that the contract is "void and
unenforceable."

 The Texas Supreme Court has identified only two types of declaratory-judgment claims that a plaintiff may assert against the State; a plaintiff may seek
either (1) to compel a state officer to act within his official capacity or (2) to establish
a contract's validity, enforce performance under a contract, or impose contractual
liabilities. IT-Davy, 74 S.W.3d at 855. The first category of claims are not "suits
against the State." W. D. Haden Co. v. Dodgen, 308 S.W.2d 838, 840 (Tex. 1958). 
In contrast, the second category of claims are suits against the State "because such
suits attempt to control state action by imposing liability on the State." IT-Davy, 74
S.W.3d at 856. Consequently, such suits cannot be maintained without legislative
permission. Id.

 Viron's and State Street's requests for declarations concerning the Master
Lease's validity fall squarely within the second category of declaratory-judgment
claims identified in IT-Davy and thus fall outside the trial court's subject-matter
jurisdiction. See id.

 We sustain issue three.

C. Waiver by Inverse Condemnation

 In issue two, TSU asserts that, under established Texas law, a party cannot
circumvent the State's immunity from suit by recasting a contract claim as one for
inverse condemnation. Assuming that TSU obtained the equipment pursuant to a
written contract, not through the exercise of eminent-domain powers, TSU asks us to
decide if Viron can overcome TSU's sovereign immunity simply by pleading an
inverse-condemnation claim. In issue four, TSU contends that, on the day of the
assignment, Viron did not possess a vested property right in the equipment, and the
evidence establishes that TSU acquired the equipment pursuant to its contract with
Viron, not through the exercise of eminent-domain powers. TSU questions whether
either of these facts suffice to deprive the trial court of jurisdiction over State Street's
inverse-condemnation and federal takings clause claims. 

 Both State Street and Viron alleged inverse condemnation and takings in their
pleadings. State Street asserts no contract claim against TSU and seeks no recovery
under the allegedly void Master Lease. Rather, State Street asserts that it is the owner
of the equipment by virtue of two assignments: the Viron/Academic Assignment and
the Academic/State Street Assignment. 

 1. Standing

 TSU argues that State Street lacks standing based on correspondence it sent to
TSU. On September 14, 2001, State Street sent a letter to the President of TSU,
Priscilla Slade, (15) and the former President, Harold Johnson, notifying them of TSU's
default under the Master Lease. State Street stated that, without waiving its rights
under the Master Lease, it was deferring "the re-vesting and reverting of title to the
equipment in [State Street] until such time as we have notified you of same. It should
be further noted that the unpaid Rental Payments payable continue to accrue interest
in the manner provided for late payments . . . of the [Master] Lease." (16) TSU contends
that "this letter speaks for itself--both as to State Street's acknowledgment of the
Contract's existence . . . and to State Street's lack of title to the equipment." 

 State Street argues that, through the assignment, it paid $8.5 million "for the
equipment." TSU responds, however, that State Street's payment was not "for the
equipment," but rather for "an array of rights that notably failed to include any vested
property right in the equipment." 

 With respect to Viron, TSU contends that Viron lacks standing to assert an
inverse condemnation claim because it assigned away any right it may have had in the
equipment. Viron concedes that it "does not claim ownership of the equipment. 
Viron validly assigned all its interest in the equipment in question to State Street
Bank so the inverse condemnation claim belongs to State Street Bank." Viron argues,
however, that, because TSU refuses to acknowledge that State Street ever acquired
any interest in the equipment by virtue of the assignment, Viron retains the property
interest and the inverse condemnation claim.

 We hold that the evidence creates a fact question regarding the standing
jurisdictional issue thus requiring us to resolve the issue in favor of Viron and State
Street. See IT-Davy, 74 S.W.3d at 855; see also Miranda, 133 S.W.3d at 227-28.

 2. Color of Contract

 TSU contends that, even if Viron and State Street had standing to pursue their
takings claims, the trial court still lacked jurisdiction because TSU acquired the
equipment under color of contractual right and thus without any intent to exercise
eminent-domain power. 

 In its third amended petition, State Street alleged, in relevant part:

 In exercising dominion over and use of the equipment, TSU
intentionally denied State Street its property and applied it for public
use.


 The past and continuing use of State Street's equipment is a physical act
that constitutes a taking of property and an unreasonable interference
with State Street's exclusive right to use and enjoy the property in
violation of the Texas and United States constitutions.


 This intentional act was done without process or a proper condemnation
proceeding.


 TSU has expressly denied it has any title to the equipment. Further, it
has acknowledged that it is not bound by any contract conferring right
to the equipment. (17) Therefore, the university is exercising eminent
domain powers. Conversely, TSU's withholding of State Street's
property is not the result of a contract dispute because the sworn
testimony of its designated representative concedes that there are no
enforceable contracts that regulate, control, or affect its right in these
matters.


 State Street seeks to recover just and adequate compensation from TSU
for the past and continuing taking of its property.

 

State Street was not required to prove these allegations at this stage of the lawsuit; all
that was required to defeat TSU's plea to the jurisdiction was a pleading of facts
showing the elements of an inverse-condemnation cause of action. See Kerr, 45
S.W.3d at 251 n.3. State Street contends that it has satisfied its obligations because
it has alleged that (1) there is no contract, (2) it owns the equipment, (3) its
assignment is valid, and (4) TSU's taking of the equipment was intentional. 

 In its second amended counterclaim and third-party petition, Viron alleged the
following with respect to its inverse-condemnation claim:

 By virtue of the assignment of the Master Lease, State Street Bank
acquired certain property rights in some of the equipment that was
installed by Viron on the TSU campus. Specifically, State Street Bank
acquired rights in equipment other than the equipment relating to the
Main Thermal Plant upgrade, which was not financed under the Master
Lease and for which TSU paid cash. By exercising dominion and
control over such other equipment, for which it has not paid, TSU has
intentionally denied State Street Bank its rights in such property. Such
action by TSU constitutes a taking of property without due process of a
proper condemnation proceeding. 


It is clear that the equipment was delivered to TSU, and its possession of the
equipment was by virtue of the Master Lease and not by virtue of a taking within the
meaning of article I, section 17 of the Texas Constitution. Tex. Const. art. I, § 17.
Viron voluntarily and with its own consent delivered the equipment to TSU after
making the Master Lease. In so doing, Viron cannot now say that the equipment was
taken under the power of eminent domain. See State v. Steck Co., 236 S.W.2d 866,
869 (Tex. Civ. App.--Austin 1951, writ ref'd) (holding that unenforcible contract
precludes legal liability and no constitutional violation).

 We hold that State Street's and Viron's pleadings and evidence fail to allege
sufficient facts to establish TSU's requisite intent under constitutional-takings
jurisprudence. See Little-Tex, 39 S.W.3d at 598-99.

 We sustain issues two and four.

Conclusion


 We affirm the trial court's orders denying TSU's pleas to the jurisdiction with
respect to Viron's contract claims and reverse the trial court's denial of TSU's pleas
to the jurisdiction relating to Viron's and State Street's inverse-condemnation and
declaratory judgment claims.



 George C. Hanks, Jr.

 Justice


Panel consists of Justices Nuchia, Keyes, and Hanks.


Justice Keyes, concurring and dissenting.








1. Appellate cause number 01-05-00758-CV pertains to TSU's plea to the jurisdiction
filed in response to State Street's claims, and appellate cause number 06-00497-CV
pertains to TSU's plea to the jurisdiction filed in response to Viron's claims.
2. The "facts" have been extracted from State Street's and Viron's pleadings.
3. TSU also paid Viron $101,100 to compensate it for its work in preparing the energy
audit.
4. The final payment was for $581,509.76.
5. These thermal chillers constituted the largest, both fiscally and physically, part of the
contract.
6. State Street asserts that Viron concealed from State Street TSU's position that the
purported Master Lease and related instruments were void for lack of authority and
the existence of other disputes between TSU and Viron, while at the same time Viron
requested and received more than $6 million out of the escrow account.
7. State Street contends that Viron's attempted "release" had no effect on the status of the
equipment or State Street's rights in it because (1) Viron had already assigned all right, title,
and interest to the equipment to State Street and (2) TSU had no legal or contractual right,
title or interest in the equipment as it never had the requisite legal authority to enter into a
contract with State Street as the owner of the equipment. 
8. State Street also sought a declaratory judgment against the other defendants and asserted
claims for conversion, unjust enrichment, breach of fiduciary duty, fraudulent transfer, alter
ego and single business enterprise, and breach of contract, warranty, and covenants.
9. Viron sued Academic Capital, Academic Services, and State Street for breach of fiduciary
duty, breach of contract, conversion, negligence, gross negligence, fraud, tortious
interference, misapplication of fiduciary property, civil conspiracy, and alter ego.
10. The Court is mindful that, under chapter 2260 of the Texas Government Code, the sole
remedy of a private party asserting a breach-of-contract claim against the state is through an
administrative process. See Tex. Gov't Code Ann. § 2260 (Vernon 2004). The
Legislature, however, has amended chapter 2260 to specify that such administrative process
does not apply to contracts "executed or awarded on or before August 30, 1999," such as
those at issue here. See Tex. Gov't Code Ann. § 2260.002(2) (Vernon Supp. 2005).
11. There is some question whether State Street and Viron alleged federal claims as well as their
state claims for inverse condemnation. We read their pleadings to assert a claim for federal
"takings" and will accordingly address both the alleged federal and state constitutional
violations. 
12. Tex. Gov't Code Ann. §§ 2260.001 -2260.006 (Vernon 2000).
13. Texas Rule of Civil Procedure 93(2) provides that "[a] pleading setting up any of the
following matters, unless the truth of such matters appear of record, shall be verified
by affidavit. . . . 2. That the plaintiff is not entitled to recover in the capacity in
which he sues . . . ." Tex. R. Civ. P. 93(2).
14. We do not find State Street's rule 93 argument persuasive. When capacity is contested, rule
93 requires that a verified plea be filed unless the truth of the matter appears of record. Tex.
R. Civ. P. 93; Sixth RMA Partners, L.P. v. Sibley, 111 S.W.3d 46, 56 (Tex. 2003). "Capacity
has been defined as a party's personal right to come into court and should not be confused
with the question of whether a party has an enforceable right or interest." Austin Nursing
Ctr., Inc. v. Lovato, 171 S.W.3d 845, 849 (Tex. 2005) (quoting 6A Wright, Miller, &
Kane, Federal Practice and Procedure: Civil 2D § 1559, at 441 (2d ed. 1990). 
Furthermore, a trial court has no discretion to refuse a trial amendment unless (1) the
opposing party presents evidence of surprise or prejudice or (2) the amendment is objected
to and asserts a new cause of action or defense and is thus prejudicial on its face. Tex. R.
Civ. P. 66; Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co., 844 S.W.2d 664, 665 (Tex.
1992); Francis v. Coastal Oil & Gas Corp., 130 S.W.3d 76, 91 (Tex. App.--Houston [1st
Dist.] 2003, no pet.). 
15. Slade was terminated from her position as president on July 17, 2006. 
16. TSU's Board of Regents, the Assistant Attorney General of Texas, and TSU's interim
general counsel were copied on the letter. 
17. These statements are derived from Wiggins's deposition. TSU responds that Wiggins's
testimony is not binding and simply represents a "subsequently adopted litigation position."