# IN THE SUPREME COURT OF TEXAS

No. 14-0747

GLENN HEGAR, IN HIS OFFICIAL CAPACITY AS TEXAS COMPTROLLER, AND KEN PAXTON, IN HIS OFFICIAL CAPACITY AS TEXAS ATTORNEY GENERAL, PETITIONERS,

v.

TEXAS SMALL TOBACCO COALITION, AND GLOBAL TOBACCO, INC., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued December 8, 2015**

JUSTICE WILLETT delivered the opinion of the Court.

Amid nationwide tobacco litigation in the 1990s, the State of Texas individually settled its lawsuit against several of the largest tobacco companies over smoking-related Medicaid costs. The multibillion dollar settlement principally requires the settling manufacturers to make annual payments of approximately $500 million to the State in perpetuity. In return, the State waived without limitation, among other things, any future reimbursement claims against the settling manufacturers.

In 2013, the Legislature passed House Bill 3536, which sought to recover the State's health care costs imposed by *non*-settling manufacturers' products through a tax on those manufacturers. This case concerns whether that taxation scheme violates the Equal and Uniform Clause of the Texas Constitution. We hold that it does not. Accordingly, we reverse the court of appeals'

judgment and remand to that court for consideration of the non-settling manufacturers' remaining challenges to the tax.

## I

In this case, we write against the backdrop of national tobacco litigation, a momentous era culminating in some of the largest and most extensive civil litigation settlements in American history. We begin with an overview of the tobacco liability claims of the 1990s before turning to the facts of this case.

## A

This case arises in part from historic litigation that buffeted the tobacco industry in the last decade of the twentieth century. The Lone Star State was a significant player in that litigation. Just over twenty years ago, Texas sued several of the nation's leading tobacco companies, asserting violations of numerous state and federal fraud, racketeering, antitrust, conspiracy, and other laws.

Texas's claims were that these companies knowingly misrepresented their products as safe and targeted minors in their advertisements. More than 40 states filed similar suits against the tobacco industry. The companies' collective defense faltered, however, when one of the companies, Liggett, settled with Texas and several other states (the Liggett Settlement), agreeing in large part to cooperate with the states in their suits against the remaining defendants. As relevant here, Liggett agreed to make annual payments to the states, and the states waived their claims against Liggett. The Liggett Settlement led to settlement negotiations involving the remaining defendants that culminated in a nationwide settlement and state-specific settlements.

The Liggett Settlement prompted serious settlement discussions between the states and the remaining tobacco defendants. Shortly thereafter, the states and tobacco defendants executed a Memorandum of Understanding and Proposed Resolution (Proposed Resolution). The Proposed

2

Resolution sought "to forge an unprecedented national resolution of the principal issues and controversies associated with the manufacture, marketing and sale of tobacco products in the United States." According to the Proposed Resolution, federal legislation would provide the vehicle for implementing the solution and ensuring "comprehensive regulation of the tobacco industry while preserving the right of individuals to assert claims for compensation."

The Proposed Resolution would primarily require the remaining defendants to make annual payments in perpetuity "to fund health benefits program expenditures and to establish and fund a tobacco products liability judgments and settlement fund." Those payments would total approximately $368.5 billion over the first 25 years. The payments would be adjusted for inflation and changes in the defendants' sales. The Proposed Resolution would also impose significant limitations on the defendants' marketing of their products. In return, the states would waive their claims against the defendants as well as future claims arising from the sale or use of tobacco products. The Proposed Resolution never became federal law, but it would serve as the blueprint for several settlements in the following months.

The Master Settlement Agreement (MSA) was the largest of the subsequent settlements, involving 46 states plus American territories and the District of Columbia (collectively, settling states). Under the MSA, the settling states released past, pending, and future claims against the remaining defendants (deemed "participating manufacturers") that sought "recovery for Medicaid and other public health expenses incurred in the treatment of smoking-induced illnesses." Tracking the Proposed Resolution, the MSA required the participating manufacturers to make initial payments followed by perpetual annual payments based on their market share and product sales. The MSA also imposed marketing restrictions on the participating manufacturers, forbidding advertising to minors and requiring initiatives to prevent such advertising. The MSA permits other

tobacco manufacturers to join the MSA, generally requiring these "subsequent participating manufacturers" to comply with the MSA's restrictions and ongoing payment scheme to receive the same release of claims that the participating manufacturers received.

Texas was not a party to the MSA. Instead, Texas and three other states—Minnesota, Mississippi, and Florida—reached individual settlements with the remaining tobacco defendants. For purposes of this case, the differences between these settlements are negligible. The Texas Comprehensive Settlement Agreement and Release (Comprehensive Settlement) accomplished much of what the Proposed Resolution would have accomplished, exemplified by the Comprehensive Settlement's constant invocation of the Proposed Resolution and the Proposed Resolution's attachment to the Comprehensive Settlement as an appendix. It stated that Texas and the remaining defendants (settling manufacturers)—Philip Morris, Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Co., Lorillard Tobacco Co., and United States Tobacco Co.— desired to settle on terms "comparable to those contained in the Proposed Resolution, which terms will achieve for Texas immediately and with certainty the financial benefits it would receive pursuant to the Proposed Resolution."

The Comprehensive Settlement required the settling manufacturers to make initial payments to Texas of $725 million—Texas's 7.25% share of the $10 billion initial payment to the states set out in the Proposed Resolution. The Comprehensive Settlement also required the settling manufacturers to make annual payments in perpetuity. Adjusted by inflation and the settling manufacturers' market share and product sales, the payments may increase, decrease, and even end if a manufacturer stops selling tobacco products altogether. The Comprehensive Settlement stated that the initial payments "constitute[d] reimbursement for public health expenditures by the State of Texas." It further stated that "[a]ll other payments . . . are in satisfaction of all of the State

4

of Texas's claims for damages incurred by the State in the year of payment or earlier years, including those for reimbursement of Medicaid expenditures and punitive damages." Pursuant to a most-favored-nation provision, the amount of the payments corresponds to the amount required under the Minnesota settlement, which costs settling manufacturers approximately $0.64 per cigarette pack. The parties to this litigation do not dispute that the settling manufacturers' payments to the State result in annual revenue of approximately $500 million.

As in the MSA and Proposed Resolution, the Comprehensive Settlement prohibited the settling manufacturers from marketing to minors and required them to support programs created to reduce underage smoking. Further, the Comprehensive Settlement prevented the settling manufacturers from opposing any legislative or administrative initiatives to strengthen penalties for tobacco-product sales to minors and for minors in possession of those products.

In return, the Settlement secured robust immunity for the settling manufacturers, though they admitted no wrongdoing and disclaimed any liability. Texas released all past claims "that were or could have been made in this action or any comparable federal or state action." And as to future claims, Texas released those claims "directly or indirectly based on . . . the use of or exposure to Tobacco Products manufactured in the ordinary course of business, including without any limitation any future claims for reimbursement for health care costs allegedly associated with use of or exposure to Tobacco Products."

**B**

But what of those tobacco manufacturers who are not parties to either the MSA or the state-specific settlements? The Proposed Resolution cautioned that its achievements "would be substantially undercut if certain companies were free to ignore the limitations it imposes, and were instead able to sell tobacco products at lower prices (because they were not making the payments

5

described above) and through less restricted advertising and marketing activities." Following the Proposed Resolution's idea of imposing ongoing payments or escrow obligations on these non-settling manufacturers (NSMs), the MSA and individually settling states established similar methods of dealing with NSMs.

The MSA suggested, and every MSA state has enacted, an escrow statute that requires "non-participating manufacturers" to deposit annual fees. The statutes generally provide that the MSA states can recover a judgment or settlement against NSMs from those escrow accounts. But if any fees remain in the escrow accounts after 25 years, they may be returned with interest to the manufacturers who paid the fees. NSMs have challenged those statutes on due-process and equal-protection grounds, but every federal court to consider those challenges has rejected them.[1]

Minnesota sought to achieve the same goal through a tax on NSMs. That tax currently equates to $.50 per cigarette pack. In 2006, the Minnesota Supreme Court considered the NSMs' challenge to that tax on equal-and-uniform grounds and rejected the challenge, upholding the tax as rational and reasonably related to its goals of recovering health care costs and reducing underage smoking.[2]

In 2013, Texas followed suit. The Legislature passed House Bill 3536, which added Subchapter V to Chapter 161 of the Texas Health & Safety Code. Subchapter V imposes a tax,[3] similar to Minnesota's tax, on NSMs, defined as manufacturers of cigarettes or cigarette tobacco

---

[1] *See Xcaliber Int'l Ltd. v. Louisiana.*, 612 F.3d 368 (5th Cir. 2010); *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929 (8th Cir. 2009); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005); *Star Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002); *S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604 (M.D. Tenn. 2005); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000).

[2] *See Council of Indep. Tobacco Mfrs. of Am. v. State*, 713 N.W.2d 300 (Minn. 2006).

[3] The statute calls the measure a "fee," but all parties agree that the measure functions as a tax subject to the Equal and Uniform Clause. *See TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 175 n.3 (Tex. 2013).

products that did not sign either the Liggett Settlement or the Comprehensive Settlement.[4] The

Legislature enumerated various purposes underlying the tax:

> (1) recover health care costs to the state imposed by non-settling manufacturers;
>
> (2) prevent non-settling manufacturers from undermining this state's policy of reducing underage smoking by offering cigarettes and cigarette tobacco products at prices that are substantially below the prices of cigarettes and cigarette tobacco products of other manufacturers;
>
> (3) protect the tobacco settlement agreement and funding, which has been reduced because of the growth of sales of non-settling manufacturer cigarettes and cigarette tobacco products, for programs that are funded wholly or partly by payments to this state under the tobacco settlement agreement and recoup for this state settlement payment revenue lost because of sales of non-settling manufacturer cigarettes and cigarette tobacco products;
>
> (4) ensure evenhanded treatment of manufacturers and further protect the tobacco settlement agreement and funding by imposing a partial payment obligation on non-settling manufacturers that already make payments on Texas sales under the master settlement agreement until a credit amendment to that agreement that will provide those manufacturers with a credit for payments to Texas is effective; and
>
> (5) provide funding for any purpose the legislature determines.[5]

The tax is approximately $0.55 per cigarette pack for NSMs who did not join the MSA, and $0.15

per cigarette pack for those NSMs who became subsequent participating manufacturers under the

MSA. All taxes paid "shall apply on a dollar for dollar basis to reduce any judgment or settlement

on a released claim brought against the manufacturer that made the payment."[6]

## C

Respondents in this case (collectively, the Coalition) are manufacturers, retailers, and

distributors who are subject to this taxation scheme. The Coalition sued the Comptroller and

Attorney General (the State), alleging that the tax is unconstitutional under the Equal and Uniform

---

[4] *See* TEX. HEALTH & SAFETY CODE §§ 161.602–.603.

[5] *Id.* § 161.601.

[6] *Id.* § 161.612.

Clause of the Texas Constitution and the Equal Protection and Due Process Clauses of the United States Constitution. Specifically, the Coalition claimed that the tax classifications unconstitutionally discriminate against NSMs. The State filed a plea to the jurisdiction, claiming, among other things, that the Coalition had not pleaded viable constitutional claims. The trial court considered that plea along with competing motions for summary judgment. The court rejected the plea and the State's motion for summary judgment, and granted the Coalition's motion for summary judgment, declaring the tax unconstitutional under both the Texas Constitution and the United States Constitution.

The court of appeals affirmed by addressing only the Equal and Uniform Clause claim.[7] The court found no difference between settling manufacturers' products and NSMs' products.[8] It described the Legislature's purposes as "laudable," but nonetheless held that "imposing a tax on only one class of identical products is not equal and uniform under Texas law and cannot be upheld."[9]

We granted the State's petition for review. The Coalition has agreed that its legal arguments "are the same for both the Texas Settlement Agreement and the Liggett Agreement." For ease of reference, we therefore proceed on that understanding, denoting both settlements as "the Settlement" and denoting the settling companies under both settlements collectively as "settling manufacturers," as Chapter 161 does.

---

[7] 440 S.W.3d 304.

[8] *Id.* at 311.

[9] *Id.*

## II

The Equal and Uniform Clause is succinct: "Taxation shall be equal and uniform."[10] That mandate generally applies only *within* classes, not *between* classes, and so we have established a two-pronged framework within which we assess the validity of statutory tax classifications. First, a challenged statute is entitled to a "strong presumption" of constitutional validity.[11] This presumption is particularly robust where the constitutionality of taxation statutes is challenged.[12] Second, the Legislature need only have a rational basis in constructing tax classifications.[13] That is, the Legislature must "attempt to group similar things and differentiate dissimilar things" in formulating rational classifications, and must show that the classifications reasonably relate to the purpose of the tax.[14] And above all, "the Legislature must have discretion in structuring tax laws."[15]

No party questions the applicability of the presumption of constitutionality here. Instead, the parties dispute the formulation and application of the rational-basis standard. We therefore begin with a clarification of that standard and then apply it to the facts before us.

## A

The parties primarily debate the correctness of the court of appeals' rendition of the rational-basis standard. The court of appeals emphasized that, in assessing the rationality of tax

---

[10] TEX. CONST. art. VIII, § 1(a).

[11] *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex. 1989).

[12] *In re Nestle USA, Inc.*, 387 S.W.3d 610, 623 (Tex. 2012) (citing *Vinson*, 773 S.W.2d at 266).

[13] *See id.* at 622–23.

[14] *See id.*

[15] *Id.* at 623.

classifications, its "focus must be on the subject of the tax, not the entity being taxed."[16] The court then observed that both settling manufacturers and NSMs make identical tobacco products, which were, in its view, the taxed subject matter.[17] Therefore, the court reasoned, despite the "laudable" goals of recovering health care costs to the State and reducing underage smoking, "imposing a tax on only one class of identical products is not equal and uniform under Texas law and cannot be upheld."[18] The State says that a difference in products may be a *sufficient* condition for upholding different tax classifications, but it is not a *necessary* condition. The Coalition counters that, pursuant to its test, the court of appeals appropriately sought to identify *any* difference between settling manufacturers and NSMs and found none.

We do not think the court of appeals' analysis can be read as generously as the Coalition suggests. In addition to its emphasis in the quotations above on the nature of the products, the court repeated that refrain at least two more times. The court stated that there was "no indication in this record that the taxed subject matter . . . differs even slightly when manufactured by [NSMs] versus [settling manufacturers]."[19] Elsewhere, it looked for "justif[ication] [for] the unequal treatment of identical products."[20] Given the court's earlier statement that its "focus must be on the subject of the tax, not the entity being taxed,"[21] it appears the court kept its word by focusing only on the identical nature of the tobacco products manufactured by settling manufacturers and NSMs.

---

[16] 440 S.W.3d 304, 311.

[17] *See id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

That constricted approach diverges from our settled precedent. We have made clear that, "[a]t least where non-property taxes are concerned, the Equal and Uniform Clause generally only prohibits unequal or multiform taxes that are imposed on members of the same class *of taxpayers*."[22] This understanding is deeply embedded in our caselaw. Over 100 years ago, we asked in *Texas Co. v. Stephens* in the occupation-tax context whether "an attempted classification has [any] reasonable basis in the nature of the *businesses* classified[.]"[23] And just a few Terms ago, we reaffirmed this understanding in *Nestle*, another occupation-tax case, noting that "classifying taxpayers for purposes of an occupation tax is not an exception to the Equal and Uniform Clause but a consequence of it."[24] The court of appeals' insistence on focusing on the products and *not* on the entity being taxed is thus at odds with the concerns of the Equal and Uniform Clause. Products do not pay taxes; taxpayers do. For that reason, in the non-property context, the nature of the taxpayer necessarily lies at the heart of any Equal and Uniform Clause inquiry.

This is not to say that differences in taxpayers' products are wholly irrelevant to this inquiry. The Legislature may well find those differences helpful in distinguishing one taxpayer from another. For example, no reasonable person would dispute that an ice cream manufacturer could be classified differently than a computer manufacturer. On that understanding, we have previously mentioned a "[d]ifference[] in the commodities sold or services rendered" as a difference to which the Legislature may look in constructing tax classifications.[25] In the same vein,

---

[22] *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 181 (Tex. 2013) (emphasis added).

[23] *Tex. Co. v. Stephens*, 103 S.W. 481, 485 (Tex. 1907) (emphasis added).

[24] *Nestle*, 387 S.W.3d at 620.

[25] *Dancetown, U.S.A., Inc. v. State*, 439 S.W.2d 333, 336 (Tex. 1969).

we have explained that "[d]ifferences in the profits derived" and "differences in methods of conducting businesses" are also permissible differences upon which the Legislature may rely.[26] Although those differences may be sufficient to sustain tax classifications, none of those differences are the sine qua non of rational tax classifications. Nor is that list of differences exclusive. Our precedents may only be said to delineate the core, not the perimeter, of permissible tax-classification distinctions. All of this flows from the fact that the Legislature retains full discretion when it "attempt[s] to group similar things and differentiate dissimilar things,"[27] subject, of course, to the general rule that the differences must be real, not fanciful.[28] Absent a violation of that rule, our deferential tradition compels respect for the Legislature's differentiating function.

In the end, the Equal and Uniform Clause primarily suggests a question as simple as its text: Is the challenged tax classification rational and reasonably related to the purpose of the tax?

**B**

Applying that familiar standard, we have little trouble finding that this taxation scheme does not violate the Equal and Uniform Clause.

The Legislature's distinction between settling manufacturers and NSMs is rational on at least two grounds. First, no party disputes that the settling manufacturers shoulder a $500-million-per-year burden that NSMs do not bear. Asked directly about that distinction at oral argument, the Coalition's counsel candidly admitted, "Apart from [this] tax, [we] would not be paying anything"

---

[26] *See Stephens*, 103 S.W. at 485; *Hurt v. Cooper*, 110 S.W.2d 896, 901 (Tex. 1937).

[27] *Nestle*, 387 S.W.3d at 622. *See also id.* at 623 ("[W]e believe that the Legislature must have discretion in structuring tax laws."); *Stephens*, 103 S.W. at 485 ("The considerations upon which [tax] classifications shall be based are primarily within the discretion of the Legislature.").

[28] *See Stephens*, 103 S.W. at 485 ("The courts . . . can only interfere when it is made clearly to appear that an attempted classification has no reasonable basis in the nature of the businesses classified, and that the law operates unequally upon subjects between which there is no *real* difference to justify the separate treatment of them undertaken by the Legislature." (emphasis added)).

to the State. Second, the settling manufacturers function under operating restrictions to which NSMs are not subject. The Coalition says it operates under similar restrictions because it too is legally prohibited from using marketing tactics designed to entice youth. But the Settlement's operating restrictions go further than prohibiting certain marketing tactics. The Settlement prohibits the settling manufacturers from "challeng[ing] existing or proposed legislative or administrative initiatives insofar as they effectuate" objectives like strengthening civil penalties for sales of tobacco products to minors and for minors in possession of these products. That restriction would implicate serious First Amendment concerns if not for the settling manufacturers' agreement, and the Coalition has pointed us to no evidence in the record that its members are subject to a similar restriction.

Those distinctions establish sufficient differences in business operations to justify the non-settling-manufacturer and settling-manufacturer tax classifications. Our emphasis on businesses' burdens in *Nestle* indicates as much. There, we assessed different franchise-tax classifications and upheld them based on the different burdens the businesses could bear: "[T]he Legislature could certainly conclude that employers' burdens—like compensation, unemployment insurance, and vicarious liability—are greater than those for a business whose work is done by independent contractors."[29] That distinction by analogy is even stronger here. Whereas an employer in *Nestle* *could* be subject to higher payments, the settling manufacturers *are* subject to higher payments. Indeed, we deferred to what the Legislature "could certainly conclude" in *Nestle*,[30] but here we need only accept the Coalition's concession that its members make no comparable payments to the State. The restriction on the settling manufacturers' challenges to legislative and administrative

---

[29] *Nestle*, 387 S.W.3d at 623.

[30] *Id.*

initiatives further accentuates the differences between settling manufacturers and NSMs. *A fortiori* the differences in burdens—"the conditions under which [the businesses] are pursued"[31]—render these tax classifications rational.

The Legislature has also articulated legitimate purposes for the tax. The Legislature primarily aimed to "recover health care costs to the state imposed by non-settling manufacturers," and "prevent non-settling manufacturers from undermining this state's policy of reducing underage smoking by offering cigarettes and cigarette tobacco products at prices that are substantially below the prices of cigarettes and cigarette tobacco products of other manufacturers."[32] The Coalition concedes that all tobacco products impose health care costs on the State, and it does not seriously dispute that the State may generally seek to recover those costs. It also acknowledges that "the government has a legitimate interest in preventing underage smoking." And rightly so. In *American Tobacco Co. v. Grinnell*, we observed that until the late-twentieth century, "unlike the general dangers associated with smoking, . . . the danger of addiction from smoking cigarettes was not widely known and recognized in the community in general, or, particularly, by children or adolescents."[33] We cited approvingly to a Food and Drug Administration regulation, which explained that "because of tobacco's addictive effects, the only way to prevent the ensuing disease and death is to prevent children and adolescents from starting to use tobacco[.]"[34] We therefore

---

[31] *Stephens*, 103 S.W. at 485.

[32] TEX. HEALTH & SAFETY CODE §§ 161.601(1)–(2).

[33] 951 S.W.2d 420, 430 (Tex. 1997).

[34] *Id.* at 430–31. *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[T]obacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States.").

14

agree with the Coalition that recovering health care costs to the State and preventing underage smoking are legitimate purposes underlying the tax.[35]

And finally, the tax classifications are reasonably related to the goals of recovering health care costs and reducing underage smoking. The parties have stipulated that all tobacco products impose health care costs on the State. And the Coalition recognizes that the payments under the Settlement, at least *in part*, reimburse the State for health care costs that flow from settling manufacturers' products. Because no similar reimbursement mechanism was in place for NSMs, it was logical for the Legislature to recover those costs from NSMs whose products create the same health risks. As a corollary, the Legislature could have reasonably determined that if NSMs did not bear the health care costs of their products, they could offer their products at prices substantially lower than the prices of settling manufacturers' products, which would entice youth and undermine the goal of reducing underage smoking. The Legislature in fact *did* so determine,[36] and we hold its classifications are sufficiently related to its stated goals.

\*        \*        \*

At bottom, the tax classifications do not violate the Equal and Uniform Clause.

**III**

---

[35] Having found these purposes constitutionally sufficient, we do not consider the Coalition's argument that the Legislature's other purposes impermissibly seek to protect settling manufacturers' market share. For that proposition, the Coalition relies upon various antitrust cases together with writings from our recent Due Course of Law decision in *Patel v. Texas Department of Licensing & Regulation*, __ S.W.3d __, 2015 WL 3982687 (Tex. June 26, 2015). It appears the Coalition represented to the court of appeals that it "filed suit requesting the trial court to declare the Act unconstitutional as violating the . . . Due Course of Law Clause[] of the Texas Constitution," Appellee's Br. 13, even though its amended petition never mentions that Clause. And the Coalition argued at length in the court of appeals about the Due Course of Law Clause. *See id.* at 35–37. We think those cases and their tests are properly limited to the particular legal frameworks in which they arose, and in any event, we leave it to the court of appeals to determine whether the Coalition has preserved what amounts to a Due Course of Law challenge.

[36] *See* TEX. HEALTH & SAFETY CODE § 161.601(2).

15

The Coalition raises a number of objections to this taxation scheme. It first argues that a settlement may never be considered to classify and tax non-settling parties differently. It then argues that even if a settlement may be considered, the effect of *this* Settlement should not be considered because its perpetual restrictions on settling manufacturers are their punishment for past conduct, and it would be unconstitutional to subject NSMs to similar conditions when they were never sued and never settled. Its final argument is that the Legislature should have taxed *all* manufacturers, not only NSMs, if it truly wanted to recover health care costs. We find none of these arguments persuasive.

## A

The Coalition's broadest argument is that "it is never reasonable to use a private settlement agreement to resolve litigation as a basis for discriminatory taxation."[37] But we have previously approved the effect of a settlement in the face of an Equal and Uniform Clause challenge. And in any event, that broad argument conflicts with the constitutional requirement that the Legislature "attempt to group similar things and differentiate dissimilar things."[38]

This is not the first time we have been asked to consider the effect of a settlement in an Equal and Uniform Clause challenge. Our decision in *Fort Worth Independent School District v. City of Fort Worth* turned in part on such a consideration.[39] In the 1930s, after the United States Court of Appeals for the Fifth Circuit held that Bell's rights-of-way for the placement of poles and

---

[37] At various points in its brief, the Coalition rephrases this objection to say that it is never reasonable to use a business's *voluntary decision* as a basis for discriminatory taxation. We agree with that formulation of the objection: A *decision* to settle cannot by itself constitutionally distinguish that business from identical businesses. But assessing the decision is not the same as assessing the *effect* of the decision. The Equal and Uniform Clause is concerned with what, if any, change in the business flows from the effect of the decision to settle.

[38] *Nestle*, 387 S.W.3d at 622.

[39] 22 S.W.3d 831 (Tex. 2000).

16

wires throughout the City of Fort Worth were taxable property interests, Bell's attorney wrote the City, stating "it will be difficult to formulate a basis of valuation that will not give rise to recurring controversies each year."[40] The attorney expressed hope for "some equitable basis" to "settle the tax question" and "thus terminate the litigation that has been in progress for several years."[41] Specifically, the attorney proposed that Bell pay the City a percentage of its gross revenue each year.[42] Bell and the City negotiated a settlement, which resulted in the City passing an ordinance that required Bell to annually pay two percent of its gross receipts "in lieu of any tax."[43] Bell then executed "a written acceptance of 'the terms of said resolution' as 'approving the settlement and compromise' of the pending litigation."[44] Bell made those annual payments for 55 years.[45]

Bell later challenged the ordinance on the ground that it violated the Equal and Uniform Clause.[46] As we noted, "[n]o other taxpayer in the district had a similar arrangement."[47] Nonetheless, we held that Bell had "failed to establish that the 1936 arrangement was unlawful."[48] Indeed, "[t]he City and the School District were authorized to settle their tax dispute with Bell, which involved difficult valuation issues that were likely to be disputed for years, by agreeing to

---

[40] *Id.* at 835–36.

[41] *Id.* at 836.

[42] *Id.*

[43] *See id.* at 836–37.

[44] *Id.* at 838.

[45] *See id.*

[46] *Id.* at 839.

[47] *Id.* at 844.

[48] *Id.*

an amount that they were satisfied would approximate the tax liability."[49] We cautioned that "[n]either a taxing authority nor a taxpayer can circumvent the constitutional restrictions on, or requirements for, taxation merely by agreeing to settle a dispute."[50] But it is equally true, we stated, that "a fair settlement of a legitimate dispute that contemplates the market value of the property is not unconstitutional simply because it is not an appraisal and assessment done by standard procedure."[51] We therefore held that Bell had failed to establish a violation of the Equal and Uniform Clause.[52]

As with all other cases, that case is, of course, distinguishable on the facts—it dealt with ad valorem taxes, the settlement was a clear attempt to approximate tax liability, the underlying litigation giving rise to the settlement did not contain allegations of wrongdoing, and the property taxpayers not privy to the settlement were not necessarily "competitors" with Bell. All true enough. But as to the broader question of whether the Legislature may, at least in some circumstances, look to the effect of a settlement when establishing tax classifications, that case is not meaningfully distinguishable. Indeed, ours would be an exceedingly odd jurisprudence if it found the effect of a settlement not only constitutionally *significant* but also constitutionally *sufficient* to satisfy tax liability pursuant to the Equal and Uniform Clause, but a verboten consideration when the Legislature ponders whether to impose a tax *at all*. A fair reading of *Fort Worth Independent School District* does not compel that result.

---

[49] *Id.* at 844–45.

[50] *Id.* at 845.

[51] *Id.*

[52] *See id.*

18

And for good reason: We have time and again underscored that it is the province of the Legislature to "attempt to group similar things and differentiate dissimilar things."[53] The discretion inherent in that authority is hobbled by no substantial handicap other than the overriding rule that any claimed difference be "real."[54] That discretion does not require the Legislature to turn a blind eye to the real-world consequences of litigation. Such a blinkered approach would be irrational. At least when the effect of a settlement is to fundamentally transform an entity's business operation, that effect can be considered. We think that incurring a perpetual $500-million-per-year burden is a sufficiently fundamental transformation that distinguishes settling manufacturers from the Coalition, which, in its own words, "would not be paying anything" absent this tax. The Legislature was thus within its discretion to consider the effect of the Settlement when establishing the settling-manufacturer and NSM tax classifications.

The Coalition complains that there is no workable test that would govern when the Legislature may properly consider a settlement—how wide-ranging must the settlement be? How important must the settlement be? To whom must the settlement be important? What purposes underlying the settlement are relevant in the Equal and Uniform Clause inquiry? All good questions that we need not answer today. Suffice it to say that in the mine run of cases, aside from tax-liability-approximation cases like *Fort Worth Independent School District*, settlements will be unlikely to so fundamentally transform an entity's business operation as to permit the Legislature's consideration. This case may well concern the most extreme settlement that we will ever consider, as evidenced by the State's acknowledgment that the Settlement accomplished changes that

---

[53] *Nestle*, 387 S.W.3d at 622.

[54] *Tex. Co. v. Stephens*, 103 S.W. 481, 485 (Tex. 1907).

19

"neither legislation nor court judgments could have accomplished." We leave for another day whether it is the *only* settlement that the Legislature may duly consider.

**B**

The Coalition's fallback argument is that the effect of *this* Settlement is an inappropriate factor for the Legislature to consider because it serves as the settling manufacturers' punishment for their pre-1998 conduct. We were never accused of wrongdoing, we were never sued, and we never had an opportunity to settle, says the Coalition, and thus the settling manufacturers' punishment cannot be a rational basis for classifying NSMs differently. The State counters that the annual payments are not punitive, but are instead annual reimbursements to the State for ongoing health care costs imposed by the settling manufacturers' products.

From the outset, it is worth pausing to appreciate the sheer breadth of the Coalition's position. Its position is that for sempiternity (or at least until the settling manufacturers decide to stop selling tobacco products), the settling manufacturers will be punished for conduct that occurred during a finite, pre-1998 period in time. Fifty, five hundred, or even five *thousand* years from now, the settling manufacturers will still be making atonement, according to the Coalition. Never mind that the Settlement expressly disclaims any wrongdoing on the part of the settling manufacturers, that punishment-centered view of the perpetual payments is breathtaking. The Coalition's only response to that observation is: The pre-1998 conduct was *really* bad.[55]

We need not divine the role of those payments today, however, because this is an Equal and Uniform Clause challenge, not a contract-interpretation dispute. Contrary to the latter, which necessarily turns on establishing the *correct* interpretation of a contract, the former turns (as

---

[55] In the Coalition's view, "the astounding allegations of wrongdoing against [settling manufacturers] in the tobacco litigation do support the large ongoing annual payments."

relevant here) on whether the Legislature's tax classification is rational. Rational-basis review does not require the Legislature to show that its understanding of the record before it is infallible. Of course, the Legislature may not rely on the preposterous, but at least where the contractual language provides firm support for the Legislature's interpretation, the Legislature cannot be said to have acted irrationally. This is the case here. The Settlement expressly provides that the State waived without limitation "any future claims for reimbursement for health care costs allegedly associated with use of or exposure to [the settling manufacturers'] Tobacco Products" in "consideration of the payments to be made by the Settling Defendants." From that language combined with the Settlement's endorsement of the Proposed Resolution's goal of accomplishing "unprecedented and comprehensive regulation of the tobacco industry," the Legislature "could certainly conclude" that the settling manufacturers, as distinct from NSMs, currently reimburse the State for ongoing health care costs associated with their products.[56] The Legislature's interpretation of the payments under the Settlement is therefore rational.[57]

Moreover, as a matter of judicial restraint, we *must* not decide the meaning of those payments today. Though no party in this case has challenged the validity of the Settlement, a definitive description of the payments either way—reimbursement for health care costs or punishment—would prematurely place a thumb on the scales in any future litigation concerning the Settlement's validity. The Coalition's counsel admitted as much at oral argument, noting in response to a suggestion that any punishment for pre-1998 conduct must cease at some point, "If they want to litigate [over whether] the contract is valid, that would be the argument to be made."

---

[56] *See Nestle*, 387 S.W.3d at 623.

[57] We express no opinion on the role, if any, of a settlement in this rational-basis analysis if the effect of the settlement was clearly intended to be punitive.

Without an actual challenge to the Settlement, without full briefing from all parties to the Settlement, and without complete vetting of the parties' potential arguments in the lower courts, we are ill-prepared to offer—and constitutionally prohibited from offering[58]—an advisory interpretation of the Settlement that could have significant, lasting consequences.

## C

The Coalition's remaining argument is that the Legislature should have taxed *everybody*—both settling manufacturers and NSMs—if it truly wanted to recover health care costs.[59] But there are commonsense reasons why the Legislature could have chosen to tax only NSMs, and our precedent compels deference to those reasons.

First, the Legislature believes (rationally so, as discussed above) that the State is already recovering from settling manufacturers the health care costs that flow from the settling manufacturers' products. It would be nigh irrational to demand these costs two times over. Our Constitution does not require the Legislature to err on the side of taxation.

Second, if the Legislature had enacted an across-the-board tax, it would have been forced to undermine at least one of its policy goals, which was to prevent underage smoking. The Legislature's theory was that, contrary to the settling manufacturers, NSMs had the distinct advantage of not bearing the health care costs of their products, thereby enabling them to offer their products at lower prices more attractive to youth. Reducing underage smoking, the theory goes, thus depends upon NSMs bearing the burden of the health care costs imposed by their

---

[58] *See, e.g.*, *Brooks v. Northgien Ass'n*, 141 S.W.3d 158, 164 (Tex. 2004) ("A judicial decision reached without a case or controversy is an advisory opinion, which is barred by the separation of powers provision of the Texas Constitution." (citing TEX. CONST. art. II, § 1)).

[59] Of course the Legislature is not *required* to tax everybody. As discussed above, settling and non-settling manufacturers comprise different classes, and the Equal and Uniform Clause only applies *within* classes.

products. But if the Legislature were forced to tax both settling manufacturers and NSMs, that tax would *double* the settling manufacturers' cost burden, while only subjecting NSMs to one layer of costs, potentially leaving unresolved one of the initial problems the Legislature set out to fix: The cost-burden disparity between settling manufacturers and NSMs, along with the concerns of that disparity's effect on underage smoking, would remain unchanged. It was therefore rational for the Legislature to decline to tax the settling manufacturers.

*    *    *

Our Equal and Uniform Clause caselaw explains that "only an extreme and clear case . . . would justify an interference by the courts with the legislative action."[60] This is not that case. Whatever may be said of the tax, it is not "an arbitrary, unreasonable, or unreal one,"[61] and it thus does not violate the Equal and Uniform Clause.

We therefore reverse the court of appeals' judgment and remand to the court of appeals for consideration of the Coalition's remaining challenges to the tax.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** April 1, 2016

---

[60] *Stephens*, 103 S.W. at 485.

[61] *Id.*