STATE of Texas, et al./OPERATING
CONTRACTORS ABS EMISSIONS,
INC., et al., Appellants,

v.

OPERATING CONTRACTORS/STATE
of Texas, et al., Appellees.

No. 03–97–00497–CV

Court of Appeals of Texas,
Austin.

Jan. 28, 1999.

Rehearing Overruled March 18, 1999.

Debora McWilliams Alsup, Thompson & Knight, P.C., Austin, for Appellants.

D. Douglas Brothers, Brothers & Thomas, Austin, R. Terry Bell, Bell, Nunnally & Martin PLLC, Dallas, Williams Powers, Jr., Austin, for Appellees.

Before Justices KIDD, B.A. SMITH and POWERS.*

MACK KIDD, Justice.

Appellant, the State of Texas, et al. (the "State"), and appellee, the Operating Contractors (the "OCs"), et al., bring cross appeals from the judgment of the trial court awarding the OCs approximately $16 million in damages under the Texas and United States constitutions and approximately $7 million in attorney's fees under the Uniform Declaratory Judgment Act (the "UDJA")[1] due to the State's alleged unconstitutional repeal of a centralized automobile emissions

testing program. We will reverse and render judgment that the OCs take nothing.

## BACKGROUND

In response to amendments made by Congress to the Federal Clean Air Act in 1990, the United States Environmental Protection Agency (the "EPA") mandated periodic testing of vehicle exhaust emissions in certain geographic areas having high levels of air pollution. See 42 U.S.C. § 7401 (1994). In 1992, the EPA designated three such "nonattainment areas" in the state of Texas: the Dallas/Fort Worth, Houston/Beaumont/Port Arthur, and greater El Paso areas. To encourage compliance with the new federal air pollution standards, Congress conditioned the availability of federal highway funds on the actions of state governments in bringing state emissions testing programs into compliance with EPA guidelines. See 42 U.S.C. §§ 7509, 7410(m) (1994).

Accordingly, the Texas Legislature in 1991 authorized the Texas Air Control Board, the predecessor to the Texas Natural Resource Conservation Commission (the "TNRCC"),[2] to modify the existing state emissions testing program to better comply with the new EPA guidelines.[3] The TNRCC designed a program whereby vehicle registration would be dependent upon successful emissions testing performed by a centralized testing facility equipped with high-technology equipment. The TNRCC submitted the proposal, or state implementation plan ("SIP"), to the EPA for approval. Prior to formal EPA approval, the 1993 Legislature provided express authority to the TNRCC to contract with private entities to implement and operate the new program. See Tex. Health & Safety Code Ann. § 382.037(f) (West 1992); Act of May 24, 1993, 73d Leg., R.S., ch. 547, § 2. With EPA approval still pending, the TNRCC contracted with Tejas Testing One and Tejas Testing Two (collectively "Tejas") to manage the im-

---

* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. See Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 1997).

2. For convenience, we will refer to both the Texas Air Control Board and the TNRCC collectively as the TNRCC.

3. Prior to 1990, Texas had a decentralized emissions testing program; any qualified auto repair shop or gas station could perform emissions testing.

plementation and operation of the new program in two of the three non-attainment areas: Dallas/Fort Worth and Houston/Beaumont/Port Arthur. Tejas signed two identical Emissions Contracts (collectively the "Emissions Contract") with the State which established the responsibilities of the two contracting parties and covered a period of seven years. The EPA formally approved the Texas plan a year later.

The structure of the new program required Tejas, as the Managing Contractor, to construct and staff numerous emissions testing facilities in the Dallas/Forth Worth and Houston/Beaumont/Port Arthur areas. Pursuant to the Emissions Contract, Tejas hired local OCs to run each individual testing facility. Each of the forty-three OCs signed both a lease with Tejas leasing the testing facility from Tejas, and a Service Agreement with Tejas establishing the obligations and responsibilities of the two contracting parties.[4] The OCs signed no contract directly with the State.

The Emissions Contract between Tejas and the State and the Service Agreement between each OC and Tejas contained exculpatory clauses designed to deal with the possibility of an early termination of the new emissions testing program. The Emissions Contract contained a provision stating:

9.3 *Early Termination of the Contract without Fault by Managing Contractor.* The TNRCC may terminate this Contract in the absence of fault by the Managing Contractor .... *if the Program is repealed or substantially amended* . ... If this contract is terminated by the TNRCC prior to the Normal Termination Date for any such reason, the TNRCC agrees, to the extent funds are appropriated by the Legislature of the State of Texas for the express purpose of this section 9.3, to pay to the Managing Contractor the compensation described in this section 9.3 for property used or intended to be used in the performance of this Contract. The TNRCC agrees to take all steps necessary to request such funding from the Legislature. (emphasis added).

The Service Agreement likewise contained a clause addressing the early termination of the program:

31. *Termination of the Emissions Contract or the Lease(s):*

OC recognizes that both the TNRCC and Tejas have the right under the Emissions Contract to terminate the Emissions Contract prior to the date on which this agreement is to terminate in accordance with section 8 of this Agreement. *In the event (i) the TNRCC or Tejas terminates the Emissions Contract, or (ii) the Lease(s) terminates, then this Agreement shall automatically terminate without further action or notice.* Termination of this Agreement pursuant to this section 31 of this Agreement shall immediately and automatically terminate the Lease(s). OC agrees that it shall have *no claim for damages against Tejas or any other person, including but not limited to the TNRCC and Tejas' lessors, mortgagees, lenders and assignees,* in the event the TNRCC or Tejas terminates the Emissions Contract. (emphasis added).

Tejas and the OCs made significant investments of time and money to ensure that the emissions testing program would be operational at the agreed time. In return for this investment, Tejas stood to recoup its costs and to gain an estimated $77 million in profits over the seven year term of the Emissions Contract. Testimony by one OC at trial estimated each OC's annual salary over the seven year period to be $140,000. On January 2, 1995, the new emissions testing program became operational.

By the opening of the 1995 Legislative Session, political support for the new centralized emissions testing program had begun to erode. In addition, the legislature may have been responding to rumors that Congress was going to relax the EPA emissions testing standards.[5] Whatever the reason, after only

---

4. The relevant obligations of each OC under the terms of the Service Agreements were identical. For convenience, we refer to the agreements collectively as the "Service Agreement."

5. Congress did relax emissions testing standards in November 1995: "The Administrator of the [EPA] shall not require adoption or implementation by a State of a test-only I/M 240 enhanced

four weeks of operation, the Texas Legislature placed a 90–day moratorium on the program. *See* Tex. S.B. 19, Act of Jan. 31, 1995, 74th Leg., R.S., ch. 1. Senate Bill 19 ("S.B.19") suspended operation of the program, and also appropriated $8.8 million in order to make payments to the OCs for salaries, bonuses, and maintenance of the stations during the moratorium. Following the 90–day moratorium, the legislature passed laws permanently ending the centralized emissions testing program and reestablishing a decentralized program.[6] *See* Tex. S.B. 178, Act of May 1, 1995, 74th Leg., R.S., ch. 34. Senate Bill 178 ("S.B.178") further provided that:

> SECTION 13. Any change or amendment to the vehicle emissions inspection and maintenance program allowed or contemplated by this Act, including any change or amendment to that program negotiated and agreed to by the governor:
>
> (1) *is an amendment or repeal of that program under any contract for implementation of that program;*
>
> (2) does not constitute a default by the state under a contract for implementation of that program;
>
> (3) is not a waiver of the state's defenses available under law or under any existing contract for the implementation of that program; and
>
> (4) *does not waive the state's sovereign immunity* or any defenses available to the state.

*Id.* (emphasis added). The OCs were reimbursed by Tejas for all start-up costs incurred during the development and operation of the ill-fated program.

The TNRCC made some effort to redesign the program with Tejas to fit the new political desire for decentralization, but these efforts failed. The TNRCC estimated Tejas's losses and petitioned the legislature for the return of that investment. Pursuant to S.B.

178, the TNRCC designed a new emissions testing program and submitted it to the EPA in June 1996. The EPA approved the new program in July 1997. *See* 62 Fed.Reg. 37138–44, 40 C.F.R. § 52.2310 (1997).

After filing for bankruptcy protection in September, Tejas filed suit in district court against the State in November 1995. The OCs intervened. Both Tejas and the OCs challenged the state legislation ending the emissions testing program on a number of grounds, including both constitutional and contractual claims. The trial began in January 1997, and final judgment was signed on April 21, 1997. The trial court found that S.B. 178 amounted to an unconstitutional impairment of contract under both the Texas and United States Constitutions, and an unconstitutional taking and unconstitutional retroactive law under the Texas Constitution. *See* U.S. Const. art. I, § 10; Tex. Const. art. I, §§ 16, 17. The trial court, however, found against Tejas and the OCs on their breach of contract claims. The trial court awarded Tejas nearly $170 million in damages, interest, and attorney's fees. The trial court awarded the OCs approximately $23 million in damages and attorney's fees. The monetary awards represented lost profits estimated over the entire seven-year term contemplated by the Emissions Contract and Service Agreement. After entry of the final judgment, the State settled with Tejas. The dispute between the OCs and the State was not settled, and is now before this Court on cross-appeals. The State, in several points of error, appeals the judgment awarding the OCs $23 million. The OCs, in four points of error, appeal the trial court's failure to include pre-judgment interest in the award of damages, and appeal the trial court's failure to recognize their contract claims as an alternative basis of recovery.

## STANDARD OF REVIEW

◼ The ultimate determination of whether a statute acts in violation of the constitu-

---

vehicle inspection and maintenance program as a means of compliance with section 182 or 187 of the Clean Air Act, but the [EPA] may approve such a program if a State chooses to adopt the program as a means of compliance with such section." National Highway System Designation Act of 1995, § 348 (P.L. 104–59, November 28, 1995).

6. S.B. 178 provided: "The Commission may not require in any non-attainment area an emissions testing technology or procedure that is more stringent than a technology or procedure used or in place ... before January 1, 1994."

tion is one of law, and thus is reviewed *de novo*. *See City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984).

## DISCUSSION

We begin by examining the OCs' strongest argument: that S.B.178 comprised an unconstitutional taking under the Texas Constitution. The OCs argue that their interest in the Service Agreement rises to the level of a vested right; that each OC was essentially awarded a franchise by the State. Furthermore, by virtue of the State's legislative and administrative interference with the emissions program, these vested rights were "taken." The State argues that the Service Agreement entitled each OC to only an expectancy that the law would remain the same, and that there can be no taking because the OCs possessed no vested right. The State contends that the protections of both the Texas and U.S. Constitutions extend only to vested rights.[7] Thus, the threshold question involves whether the OCs can claim a vested right.

### Vested Rights

The State attacks the OCs' claim of a vested right in the continuation of the centralized emissions testing program. The line of the State's argument proceeds as follows: (1) the State, as a sovereign, cannot be sued for money damages without its consent, except for a takings claim;[8] (2) because the State has not given consent, the OCs can only recover under a takings claim; (3) the constitutional safeguard of "no taking without just compensation" present in the Texas and U.S. Constitutions refers only to vested property rights; (4) the OCs had no vested rights in the State's continuation of its emissions testing policy; (5) therefore, the OCs cannot recover.

▇▇▇ Before analyzing the State's argument, it is important initially to distinguish the nature of the right at issue. Texas has long recognized that, pursuant to article one, section seventeen of the Texas Constitution, a governmental taking of *real property* requires "just compensation." A landowner is subject to the eminent domain power of the State, but the State must award just compensation for the taking of property. *See Green Int'l, Inc. v. State*, 877 S.W.2d 428, 433 (Tex. App.—Austin 1994, writ dism'd); *see also Long Island Water–Supply Co. v. City of Brooklyn*, 166 U.S. 685, 689, 17 S.Ct. 718, 41 L.Ed. 1165 (1897) ("All of private property is held subject to the demands of a public use. The constitutional guaranty of just compensation is not a limitation of the power to take, but only a condition of its exercise."). Conversely, state courts have generally denied recovery from the State for *contract* damages advanced under the rubric of a constitutional takings claim. *See Green*, 877 S.W.2d at 433; *Corpus Christi v. Acme Mechanical Cont.*, 736 S.W.2d 894, 903–04 (Tex.App.—Austin 1987, writ denied) ("The concept of a taking as a compensable claim has limited application to the relative rights of the parties when those rights have been voluntarily created by contract.").[9] In a contractual ar-

---

7. *See City of Dallas v. Trammell*, 129 Tex. 150, 101 S.W.2d 1009, 1013–15 (Tex.1937) ("A right, to be within the protection of the Constitution, must be a vested right. It must be something more than a mere expectancy based upon an anticipated continuance of an existing law.") (citing *Dodge v. Board of Educ. of City of Chicago*, 364 Ill. 547, 5 N.E.2d 84 (Ill.1936)); *see also National Carloading Corp. v. Phoenix–El Paso Express*, 142 Tex. 141, 176 S.W.2d 564, 569–70 (Tex.1943) ("[P]laintiff does not possess such a vested right as to come within the inhibition of the Fifth Amendment. Such a right must be something more than a mere expectation based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property, or to present or future enforcement of a demand, or a legal exemption from the demand of another.").

8. *See Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408 (Tex.1997).

9. We are mindful that the OCs cite *Texas Parks & Wildlife Deptartment v. Callaway*, 971 S.W.2d 145 (Tex.App.—Austin 1998, no pet.) for the proposition that contractual rights can be the subject of a governmental taking under Texas law. We note, however, that *Callaway* concerned an easement, and involved the State's affirmative actions which changed the character of the waterway adjacent to *Callaway's* property from private to public. Thus, *Callaway* does not support the proposition that mere contract rights are protected by the takings clause of the Texas constitution. Moreover, easements, as opposed to the contracts at issue here, touch and concern real property.

rangement, "whenever the government acts within a color of right to take or withhold property, ... the government cannot be said to have effected a taking because there was no intent to take, only an intent to act within the scope of the contract."[10] *Green,* 877 S.W.2d at 434. The State argues that S.B. 178 concerns the proper exercise of the State's police power, and therefore the State acted within a color of right under the contract. Thus, without a vested right protected by the constitution, the OCs cannot establish the necessary intent for their takings claim.

■ The OCs, however, advance the theory that their contractual interest in the emissions testing program itself amounted to a vested right through the operation of the Service Agreement in conjunction with the Emissions Contract, and that this vested contractual right deserves constitutional protection similar to real property. The OCs further argue that S.B. 178's interference with the performance of the Service Agreement and Emissions Contract amounted to a taking; in other words, that governmental interference with their alleged vested rights can be construed as a governmental taking rather than a mere breach of contract. The OCs cite federal law to support this position. *See, e.g., United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

In *United States Trust,* the states of New Jersey and New York attempted to repeal an earlier covenant with Port Authority bondholders that limited the ability of the Port Authority of New York and New Jersey to subsidize rail passenger transportation from bond revenues and reserves. The Supreme Court of the United States held that the covenant created a contractual relationship between the states and the bondholders, and that the statutory repeal violated the contract clause of the United States Constitution by diminishing the pledged revenues and reserves. *United States Trust,* 431 U.S. at 32,

97 S.Ct. 1505. In *Lynch,* the United States Congress attempted to repeal the yearly renewable term insurance policies established in the War Risk Insurance Act. The Supreme Court of the United States held that Congress lacked the power to extinguish the contractual rights of beneficiaries under the yearly renewable term policies, although it had the power to take away the remedy. *Lynch,* 292 U.S. at 582–83, 54 S.Ct. 840.

We need not decide whether these federal cases compel the conclusion that contract rights can rise to the level of a vested right deserving constitutional protection because the situation in the instant cause is distinguishable from the cases relied upon by the OCs. The covenant at issue in *United States Trust* constituted an explicit contract between the states and the Port Authority bondholders, and the statutory language of the covenant purposefully invoked the constitutional protection of the contract clause. *United States Trust,* 431 U.S. at 18, 97 S.Ct. 1505. Similarly, in *Lynch,* the War Risk Insurance Act authorized contracts with individual insureds who paid monthly premiums as consideration for the government's obligation. *Lynch,* 292 U.S. at 575–76, 54 S.Ct. 840. In contrast, the OCs have no contract with the State.

Furthermore, both *United States Trust* and *Lynch* speak to situations where the legislation at issue primarily intended to eliminate or diminish the financial obligations of the governmental entity. The legislation in the instant cause had as its purpose the exercise of the police power of the State to regulate air pollution, and affected the State's financial obligations only tangentially.[11] This distinction between the instant cause and the cited authority arises from the applicable constitutional power under which each contested piece of legislation was passed; "the police power and the power of eminent domain were among those that could not be 'contracted away,' but the State could

---

10. To recover under a takings claim, claimant must establish: (1) the State intentionally performed certain acts; (2) which resulted in a "taking" of property; (3) for public use. *Green Int'l, Inc. v. State,* 877 S.W.2d 428, 434 (Tex. App.—Austin 1994, writ dism'd).

11. The monies appropriated by S.B. 19 for the OCs during the moratorium imply that the legislature's purposes were other than the avoidance of any financial obligation.

bind itself in the future exercise of the taxing and spending powers." *United States Trust,* 431 U.S. at 23–24, 97 S.Ct. 1505. Thus, the Supreme Court has struck down legislation that impaired existing contracts intending primarily to diminish the government's financial obligations; it has upheld legislation which impaired existing contracts, but which exemplified a legitimate exercise of the State's police power. *See Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Because the OCs had no privity of contract with the State, and because S.B. 178 flowed from the State's inherent police power, we find the federal precedent established by *United States Trust* and *Lynch* to be inapposite.

■■■ The OCs can find support in Texas case law for the proposition that the government's interference with a *franchise* implicates the takings clause and requires payment of just compensation. A franchise is a special privilege conferred by government upon an individual or organization which does not belong to the citizenry at large, and in which activity one otherwise could not engage without the franchise. *See West Tex. Util. Co. v. City of Baird,* 286 S.W.2d 185, 187 (Tex.Civ.App.—Eastland 1956, writ ref'd n.r.e.). Under Texas law, a franchise impresses its owner with vested rights. *See Brazosport Sav. & Loan Ass'n v. American Sav. & Loan Ass'n,* 161 Tex. 543, 342 S.W.2d 747 (Tex.1961). However, not every grant of an exclusive privilege constitutes a franchise. *See Johnson v. Austin,* 674 S.W.2d 894, 897 (Tex.App.—Austin 1984, no writ).

■■■ Franchises under Texas case law generally take the form of utilities, or other monopolies, created to further the public interest. *See Texas Power & Light v. City of Garland,* 431 S.W.2d 511 (Tex.1968) (electric utility); *Brazosport Sav. & Loan,* 342 S.W.2d at 750 (savings and loan associations); *City of Jacksonville v. General Tel. Co.,* 538 S.W.2d 253 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.) (telephone utility). Moreover, there must exist a contract between grantor and grantee which is mutually binding and enforceable. *City of Jacksonville,* 538 S.W.2d at 255. Whether an instrument, ordinance, or contract amounts to a franchise depends largely upon the manner of its performance in compliance with its terms. *See City of Wichita Falls v. Kemp Hotel Operating Co.,* 162 S.W.2d 150, 153 (Tex.Civ.App.—Fort Worth), *aff'd,* 141 Tex. 90, 170 S.W.2d 217 (Tex.1942). There exists strong evidence that the State granted Tejas a franchise to manage emissions testing facilities under the terms of the Emissions Contract. That issue, however, is not before this Court.

■■■ The OCs would like to argue that they also were granted individual franchises with the State to run each particular emissions testing station. We disagree. As previously established, the OCs signed no contract directly with the State. Their inclusion in the emissions testing program came about only through an intermediary: Tejas. One who claims a franchise right or privilege in derogation of the common rights of the public must prove his title thereto by a grant clearly and definitely expressed, and cannot enlarge it by equivocal or doubtful provisions or probable inferences. *Incorporated Town of Hempstead v. Gulf States Util. Co.,* 146 Tex. 250, 206 S.W.2d 227, 230 (Tex.1947). The grant of a franchise is construed in favor of the public, and, if the language used is ambiguous, the grant is to be construed in favor of the grantor and against the grantee. *Id.; see also* 37 C.J.S. *Franchises,* § 19 (1997); 41 Tex. Jur.3d *Franchises,* § 7 (1998). Nothing passes by implication by the grant of a franchise except what may be necessary to give effect to the obvious intent of the grant. *Id.* The Emissions Contract refers to the OCs only in the general terms necessary to outline the program and to define the obligations of Tejas to staff and maintain the emissions testing program. There is no language ambiguous or otherwise conferring franchises on the OCs. Thus, any franchise granted by the State was granted exclusively to Tejas. We hold that the OCs held no franchise.

Because the OCs cannot claim franchisee status, their interest in the emissions testing program did not rise to the level of a vested right. Because the OCs did not have vested rights in the continuation of the emissions testing program, they suffered no taking. Although the lack of any vested property

rights in the continuation of the testing program is itself sufficient to reverse the trial court's award of damages based on constitutional violations, we will also discuss the Service Agreement signed by the OCs that similarly restricts the ability of the OCs to recover damages.

### The Exculpatory Clause

■ The OCs could acquire no franchise because the OCs signed no contract with the State. Therefore, the OCs' formal relationship with the State existed only to the extent that the Service Agreement between Tejas and the State provided for their role in the centralized emissions testing program. Because that relationship was created by the Service Agreement, the OCs' relationship with the State terminated when that agreement was terminated.

The State advances the argument that the language of S.B. 178 itself acted to terminate the emissions testing program and the contractual relationship between Tejas and the State. Consequently, S.B. 178 similarly activated the exculpatory clause in the Service Agreement. The State argues that the exculpatory clause in the Emissions Contract, entitled *Early Termination of the Contract without Fault by Managing Contractor*, allowed the State to terminate the contract with Tejas without fault should the program be "repealed or substantially amended." The State further argues that the language of S.B. 178, specifically Section 13(1), states that the bill acts as "an amendment or repeal of that program under any contract for implementation of that program"; this speaks directly to the Emissions Contract and actuates the termination clause. Thus, according to the State, the emissions testing program terminated at the time the legislature passed S.B. 178. And, by virtue of the language in the Service Agreement that "[i]n the event the TNRCC or Tejas terminates the Emissions Contract . . . then this Agreement shall automatically terminate without further action or notice . . . ," and the "OC agrees that it shall have no claim for damages against Tejas or any other person, including but not limited to the TNRCC . . . ," the OCs have no legal recourse.

The OCs agree that the legislature intended with its language in S.B. 178 to repeal the program, but claim that the legislature lacked the authority to so act. The OCs argue that once the original SIP was approved by the EPA as a means of enforcing federal environmental standards, only a repeal or substantial amendment *approved by the EPA* could terminate the contract and end the emissions testing program. The OCs cite *Friends of the Earth v. Carey*, 535 F.2d 165 (2nd Cir.1976),[12] for the proposition that a delegated program retains its legal force despite ongoing negotiations between the EPA and a state to amend the program. The trial court agreed with the OCs and found that the emissions testing program could not have been legally repealed without formal EPA approval, and therefore the termination clause was not actuated by the language in S.B. 178. We disagree.

■ We find *Friends of the Earth* to be unpersuasive. The position of the OCs implies that federal Supremacy Clause doctrine[13] compels the legislature to refrain from action until obtaining new approval by the EPA. Consideration under the Supremacy Clause begins with the basic assumption that Congress did not intend to displace state law. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). A finding that state legislation violates the supremacy clause requires a finding of at least one of the following: (1) the subject matter of the state law has been preempted by Congress; (2) the state law prevents the achievement of a federal objective; or (3) there is an actual conflict between the state and federal law. *See Mary-*

---

12. "Since abatement and control of air pollution through systematic and timely attainment of the air quality standards is Congress' overriding objective, a plan, once adopted by a state and approved by the EPA becomes controlling and must be carried out by the state." *Friends of the Earth v. Carey*, 535 F.2d 165, 170 (2nd Cir.1976).

13. The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

*land*, 451 U.S. at 746–47, 101 S.Ct. 2114. In allowing states to regulate delegated environmental programs according to programs developed by state legislatures, the SIP program itself provides evidence that Congress has not preempted state regulation of air pollution. Furthermore, before commencement of trial, Congress passed legislation preventing the EPA from requiring states to adopt centralized testing programs. *See* National Highway System Designation Act of 1995, § 348 (P.L. 104–59, November 28, 1995). Thus, the federal objective was in harmony with the State's objective in amending the SIP. Finally, the State petitioned the EPA for approval of a substantially amended SIP, which would comply with new federal guidelines. Formal approval of the amended SIP by the EPA occurred in July 1997. 62 Fed.Reg. 37138–44, 40 C.F.R. § 52.2310 (1997). Thus, there was neither an actual conflict between state law and federal law, nor was there any interference with a federal objective. The Supremacy Clause did not block S.B. 178's repeal of the centralized emissions testing program.

 The language of S.B. 178 could not have been clearer in its intent to repeal the centralized emissions testing program. The language of both the Emissions Contract and the Service Agreement clearly contemplates just such an eventuality. The Service Agreement signed by each OC even included a waiver of the legal right to sue for damages. "[T]he right of property is subject to the reasonable exercise of the police power of the State." *See State v. Texas City*, 295 S.W.2d 697, 704 (Tex.Civ.App.—Galveston), *aff'd*, 157 Tex. 450, 303 S.W.2d 780 (Tex. 1957). The establishment of an emissions testing program falls squarely within the legitimate public purpose of regulating air quality. Therefore, S.B. 178 constituted a reasonable exercise of the police power of the legislature. As such, its repeal of the emissions testing program terminated both the Emissions Contract and the Service Agreement.

### The OCs' Constitutional Claims

 Applying the above analysis to the trial court's specific findings, we must re-verse the judgment. Because the OCs lack a contract with the State, their interest in the continuation of the emissions testing program cannot be characterized as a vested property right, either under the federal authority cited by the OCs, or under an analysis of Texas franchise law. Without a vested right, the OCs cannot claim constitutional protection under either federal or state takings doctrine. Additionally, the contracts themselves compel the conclusion that any rights held by the OCs ended when the legislature terminated the program. Furthermore, because S.B. 178 was a valid exercise of the State's police power, "it does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.'" *Blaisdell*, 290 U.S. at 435, 54 S.Ct. 231. Under these circumstances there could be no unconstitutional impairment of contract.

### Sovereign Immunity

 The OCs claim the trial court erred in not finding in their favor regarding two alternative bases for the damage award: (1) that the Emissions Contract and the Service Agreement should be read together as "one contract," and that the TNRCC breached that contract; and (2) that the OCs were third party beneficiaries of Tejas's Emissions Contract with the State. The OC's must construct a theory of contractual recovery based upon the Emissions Contract due to the waiver clause included in the Service Agreement (that the OCs shall have no claim for damages should the Emissions Contract be terminated). Both of these theories, while novel, share the same fatal flaw. The Texas Supreme Court has recently held that, while the State waives its immunity from *liability* upon contracting with a private entity, the State retains its immunity from *suit* unless the legislature expressly waives its sovereign immunity. *See Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408–09 (Tex. 1997). "It is the [l]egislature's sole province to waive or abrogate sovereign immunity." *Id.* at 409. S.B. 178 contains language expressly stating that the legislation repealing the emissions testing program "does not waive the state's sovereign immunity or any

defenses available to the state." Thus, the legislature retains its immunity from any contractual claims advanced by the OCs.[14] We agree with the trial court and overrule the OCs' two points of error regarding their contractual claims.

## CONCLUSION

The OCs maintained no vested right in the continuation of the centralized emissions testing program. Without a vested right, the OCs could not claim constitutional protection. Furthermore, sovereign immunity and the OCs' explicit waiver barred any contractual claim against the State. We therefore reverse the trial court's award of damages. Because we reverse the trial court's award of damages, we fail to reach the OCs' complaint regarding prejudgment interest. Similarly, because we render judgment that the OCs take nothing, we need not address the State's appeal of the trial court's award of attorney's fees.

---

**14.** The OCs attempt to interpret Texas Health & Safety Code Ann. § 382.032 as a waiver by the State of its immunity from suit in this case. *See* Tex. Health & Safety Code Ann. § 382.032 (West Supp.1999). We disagree. Section 382.032 allows suit in a Travis County district court by a person "affected by a ruling, order, decision or other act of the Board or of the Executive Director." *Id.* This section, however, contemplates rulings of a regulatory nature, not of a contractual nature.