# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00093-CV

**Transformative Learning System d/b/a
Transformative Charter Academy, Appellant**

**v.**

**Texas Education Agency and Michael Williams in his Official Capacity
as the Commissioner of Education, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-15-003711, HONORABLE JAN SOIFER, JUDGE PRESIDING

## O P I N I O N

Transformative Learning System (TLS) operated an open-enrollment charter school for sixteen years until its charter was revoked. Upon revocation of a school charter, Section 12.128 of the Education Code requires the Texas Education Agency (TEA) to assume control of charter-school property purchased with state funds received by a charter holder after September 1, 2001. *See* Tex. Educ. Code § 12.128(a)–(c) (requiring appointment of conservator to oversee disposition of property "purchased or leased with funds provided under Section 12.106," which funds open-enrollment charter schools). When TEA invoked section 12.128(c) and directed TLS to turn over its properties, TLS sued the agency and its Commissioner, seeking declaratory and injunctive relief from their allegedly erroneous interpretation of Section 12.128 and from the alleged taking that

would result from that interpretation. The district court sustained the defendants' plea to the jurisdiction and dismissed the case. We affirm.

**BACKGROUND**

TLS is a nonprofit organization founded in 1997 to apply for a charter to operate an open-enrollment charter school for high-risk youth. *See id.* §§ 12.110–.113 (allowing the Texas Board of Education to issue charter if applicant satisfies all statutory requirements). In 1998, TLS received its charter and opened Transformative Charter Academy in Killeen. In 2014, TEA revoked TLS's charter after the school failed state financial accountability ratings for a third consecutive year. *See* 19 Tex. Admin. Code § 100.1022(d)(1) (2018) (Tex. Educ. Agency, Standards to Revoke and Modify) ("The open-enrollment charter authorizing a charter school that has unsatisfactory compliance performance for three consecutive school years will be revoked."), (d)(2) ("For purposes of this subsection, required minimum compliance performance shall be determined [by] . . . federal and state laws and rules [and] financial accountability standards . . . ."). TLS does not challenge the revocation of the charter.

At the time of revocation, TLS possessed three tracts of real estate at issue here, located at 802, 806, and 807 North 8th Street in Killeen. In 1999, TLS bought the 807 property by making a down payment of $30,718.29 and obtaining a mortgage for the remainder of the $105,000 purchase price. The school operated from the 807 Property through 2008, when it relocated to the 802 Property.[1] The 802 and 806 Properties are adjoining buildings located on a single tract of land

---

[1] Since 2011, TLS has leased the 807 Property to a religious organization.

directly across from the 807 Property. TLS purchased the 802 Property in 2000 to expand its campus, but as part of the purchase was required to buy the 806 Property, which is allegedly unusable. TLS acquired the two properties in 2000 for around $175,000, making a down payment of $40,000 and obtaining a mortgage for the balance of the purchase price. TLS then began renovations on the 802 Property, which continued until 2008.

TLS paid for and improved the three properties from a single checking account consisting of commingled funds from state, federal, and private sources. It used Section 12.106 funds received after September 1, 2001—the effective date of the statute authorizing TEA to take possession of property purchased using state funds upon revocation of a school charter—to make mortgage payments and improvements on each of the properties. According to audited financial statements provided by TLS's accountant, TLS received approximately $7.5 million in Section 12.106 funds after September 1, 2001. Although TLS could not determine the exact amount of state funds it expended on the properties, it estimates expenditures of at least $144,060.45.[2] It is undisputed that state funds used to purchase and improve the properties exceeded expenditures from private sources. Before revocation, TLS represented on numerous financial statements that the State owns the properties.

---

[2] This figure was calculated by TLS's accountant and explained during his deposition. The accountant first determined that the total payments made to the properties, including debt service, down payments on purchases, and improvements funded by cash, totaled $935,942.69. He then determined that the combined local revenues and federal grants to TLS was $791,882.24. Finally, he subtracted that revenue from the total amount of payments made and determined that there was a shortfall of $144,060.45. The accountant concluded that this shortfall could only have been paid for with state funds. But as TEA observes, because there was no segregation of state funds from non-state funds, it is possible that the payments could have been made entirely with state funds.

In 2015, after TLS's charter was revoked, the conservator assigned to oversee the closure of the school began demanding access to and possession of the three properties. TLS refused, arguing that TEA is not entitled to assume TLS's entire ownership interest in the properties. After weeks of disagreement, the conservator ultimately reduced her demand to writing, ordering TLS to:

> execute a warranty deed to the Texas Education Agency ("TEA") for any real property purchased using state funds or declared state property on the school's annual financing reports; and

> for real property subject to a security interest or a lien, transfer the property back to the financial institution holding the lien or security interest and assign the return of any excess proceeds from that transaction to the TEA.

TLS refused to relinquish control of the properties and referred the conservator to counsel.

A month later, with the parties at an impasse, TLS sued TEA and its Commissioner in Travis County District Court, alleging constitutional and statutory takings claims against the agency and asserting an ultra vires theory against the Commissioner. It sought injunctive relief from the attempted transfer of possession and declaratory relief from TEA's allegedly erroneous interpretation of Section 12.128 of the Education Code. TLS then moved for summary judgment, asking the court to reject TEA's proposed interpretation of the statute or, alternatively, to hold that interpretation unconstitutional on its face or unconstitutional as applied to TLS. TEA responded with a plea to the jurisdiction, arguing that TLS could not state a viable claim to overcome sovereign immunity. After a hearing on the motion and the plea, the district court rendered judgment denying

4

TLS's motion for summary judgment, sustaining TEA's plea to the jurisdiction, and dismissing the case for want of jurisdiction. TLS now appeals.

## STANDARD OF REVIEW

We review de novo whether a trial court has subject-matter jurisdiction, including where the State has raised a jurisdictional plea based on sovereign immunity. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id*. "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id*. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28.

To establish the district court's jurisdiction over a controversy, a plaintiff suing the State must establish a waiver of sovereign immunity. *Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). "Otherwise, sovereign immunity from suit defeats a trial court's subject-matter jurisdiction." *Id*. Sovereign immunity does not shield the state from ultra vires claims seeking to prevent government officials from exceeding their statutory or constitutional authority. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

## DISCUSSION

TLS seeks injunctive and declaratory relief from the Commissioner's allegedly ultra vires conduct, arguing that Section 12.128 of the Education Code does not authorize the Commissioner's ongoing attempts to assume control of the disputed property. To the extent the Section allows the Commissioner to assume control of the property, TLS raises facial and as-applied constitutional challenges to the statue. We address TLS's statutory argument and constitutional claims in turn, bearing in mind that TLS's petition for relief must include at least one viable claim for which sovereign immunity from suit is waived to withstand the plea to the jurisdiction. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 475 (Tex. 2012).

### Statutory Interpretation

To address TLS's argument that Section 12.128 does not permit TEA to take possession of the properties in question, we begin with the text of the law itself. *TGS-NOPEC Geophysicial Co. v. Combs*, 340 S.W. 3d 432, 439 (Tex. 2011). In construing statutory terms, "we may consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory constructions." *Colorado Cty. v. Staff*, 510 S.W. 3d 435, 448 (Tex. 2017). We are also mindful of context, *In re Office of the Att'y Gen.*, 456 S.W. 3d. 153, 155 (Tex. 2015) (orig. proceeding) ("When construing statutes, or anything else, one cannot divorce text from context."), and consult the canons of construction where we "cannot discern legislative intent in the language of the statute itself," *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W. 3d 628, 639 (Tex. 2010).

6

"Where the statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would lead to absurd results." *Id.* (citing *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). If the statutory language is ambiguous, we consider the interpretation offered by the agency charged with administering the statute. *Hallmark Mktg. Co., LLC v. Hegar*, 488 S.W.3d 795, 797 (Tex. 2016).

Section 12.128 provides, in relevant part:

> (a) ***Property purchased or leased with funds received by a charter holder under Section 12.106 after September 1, 2001***:
>
>> (1) ***is considered to be public property for all purposes under state law***;
>> (2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school; and
>> (3) may be used only for a purpose for which a school district may use school district property.
>
> (b) If at least 50 percent of the funds used by a charter holder to purchase real property are funds received under Section 12.106 before September 1, 2001, the property is considered to be public property to the extent it was purchased with those funds.
>
> (c) ***The commissioner shall***:
>
>> (1) ***take possession and assume control of the property described by Subsection (a) of an open-enrollment charter school that ceases to operate***; and
>> (2) supervise the disposition of the property in accordance with law

Tex. Educ. Code § 12.128 (emphases added).

Our evaluation of TLS's statutory argument turns on the two conditions Section 12.128 imposes on the Commissioner's authority to take possession of a charter school's property:

7

a timing requirement and a purchase requirement. As to the timing requirement, Section 12.128 provides that charter school property "purchased or leased with funds received by a charter holder under Section 12.106 after September 1, 2001," is subject to seizure. The parties agree that as of September 1, 2001, there are two categories of property–state funded or charter-school funded. They disagree over what material event occurring after September 1, 2001, triggers the Commissioner's right to assume control of the property. Further, the parties dispute whether an ongoing mortgage transaction falls within the meaning of the statutory term "purchase."

*Timing Requirement*

Upon revocation of a charter, Section 12.128 requires the seizure of charter school property "purchased or leased with funds received by a charter holder under Section 12.106 after September 1, 2001." TLS contends the prepositional phrase "after September 1, 2001," modifies the verbs "purchased" and "leased" and thus that the initial date of purchase or lease determines the extent of the Commissioner's right to assume control of and dispose of a former charter school's property. TEA argues the prepositional phrase refers not to the date of purchase or lease but to the date the Section 12.106 funds are received by a charter holder.

The Legislature requires courts to interpret its statutory language "according to the rules of grammar and common usage." Tex. Gov't Code § 311.011(a). A subsequent prepositional phrase is generally assumed to modify the nearest antecedent unless such a construction is unreasonable. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000) ("[A] qualifying phrase in a statute or the Constitution must be confined to the words and phrases immediately preceding it to which it may, without impairing the meaning of the sentence, be

8

applied . . . ."); William Strunk, Jr. & E.B. White, *The Elements of Style* 30 (4th ed. 2000) ("Modifiers should come, if possible, next to the words they modify."). Here, the nearest antecedent is the phrase "funds received by a charter holder under Section 12.106," and it is reasonable in light of the statutory framework and purpose to modify that phrase in terms of the timing of the receipt of state funds.

The 77th Legislature revised the laws governing open-enrollment charter schools to "ensure[] the fiscal and academic accountability of persons holding charters." Act of Sept. 1, 2001, 77th Leg., R.S., ch. 1504, § 1, sec. 12.001(b), 2001 Tex. Gen. Laws 5344, 5344 (codified at Tex. Educ. Code 12.001(b)). As part of that reform, the Legislature changed the way these schools are funded. Before the reform, some of an open-enrollment charter school's funding came from revenue that would otherwise have been provided to the nearest public school district. *See* 26 Tex. Reg. 8828, 8828 (Nov. 2, 2001). The legislation at issue here eliminated this local competition for funding and provided instead that open-enrollment charter schools would be funded entirely and directly through state appropriation and without reference to the local school district. *See* 2001 Tex. Gen. Laws 5344, 5347–48 (codified at Tex. Educ. Code 12.106, 12.107). This funding change took effect on September 1, 2001. Tex. Gen. Laws at 5362 (codified at Tex. Educ. Code 12.107). Given the state's increased share of charter-school funding as of that date, it follows naturally that the Legislature would also increase the Commissioner's authority to assume control of property purchased with those funds after that date.

9

*Purchase Requirement*

With regard to the other statutory construction question, Section 12.128 applies to charter school property "purchased or leased" with funds received after September 1, 2001. The parties disagree as to what constitutes a "purchase" for the purpose of this statute. TEA claims that TLS purchased the properties with Section 12.106 funds received after September 1, 2001, emphasizing the undisputed facts that after that date TLS accepted Section 12.106 funding and used commingled funds to make mortgage payments on the 802, 806, and 807 Properties. TLS maintains that it purchased these properties the day the respective transactions closed and the warranty deeds changed hands—in 1999 and 2000—and thus any funds received after September 1, 2001, were not used toward the respective purchases.

The text, context, and agency construction support the conclusion that mortgage payments are "purchases" under Section 12.128. Because Chapter 12 of the Education Code does not define the term "purchase," *see* Tex. Educ. Code § 12.1012 ("Definitions"), we look for the ordinary meaning of the term, *TGS-NOPEC,* 340 S.W. 3d at 439 ("Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning."). Dictionaries are useful resources for discerning the ordinary meaning of statutory terms. *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) ("Often, we consult dictionaries to discern the natural meaning of a common-usage term not defined by contract, statute, or regulation."). The dictionary definition of the term "purchase" encompasses the act of acquiring property by paying the entire purchase price at the time of sale or over time through mortgage payments. *Black's Law Dictionary*, for example, defines the

term as the "act or an instance of buying" or "[t]he acquisition of an interest in real or personal property by sale, discount, negotiation, *mortgage*, pledge, lien, issue, reissue, gift, or any other voluntary transaction." *Purchase*, *Black's Law Dictionary* (10th ed. 2014) (emphasis added). Similarly, Webster provides that to "purchase" means to acquire something "by any legal means other than descent or inheritance." *Webster's Third New International Dictionary* (Philip Gove ed., 1993) (emphasis added). These dictionary definitions demonstrate that the ordinary understanding of the term "purchase" is sufficiently broad to cover a range of transactions, including ongoing acquisitions occurring over a period of time, such as mortgage transactions.

Moreover, other Texas statutes expressly define "purchase" to include mortgage transactions. For example, the Texas Uniform Commercial Code ("UCC") defines a "purchase" to mean any "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." Tex. Bus. & Com. Code § 1.201(b)(29). The consistent usage of terms in other statutes is another relevant factor in determining a term's plain meaning. *See Colorado Cty.*, 510 S.W. 3d at 448; Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes."). Like the legal and lay dictionaries already cited, the UCC defines purchase broadly to mean "any . . . voluntary transaction" and expressly includes mortgage within the definition. The UCC's definition is additional evidence that mortgage transactions are within the ordinary meaning of the term "purchase" in Section 12.108.

11

Contextual analysis also supports construing "purchase" to include mortgage transactions. The statutory framework manifests a legislative intent to enhance the financial oversight of charter schools receiving state tax dollars. The Legislature stated that its purpose in enacting Chapter 12 was to "ensure[] the fiscal and academic accountability of persons holding charters." 2001 Tex. Gen. Laws 5344, 5344 (codified at Tex. Educ. Code 12.001(b)). And it endeavored to achieve this purpose by providing that charter-school property purchased with funds received after September 1, 2001, would be considered "public property" and "property of the state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school." Tex. Educ. Code § 12.128(a)(1). To construe purchase so as to avoid applying the statute to charter schools that use state tax dollars received after September 1, 2001, to pay off mortgages is incompatible with the accountability provisions in the same statute.

TLS argues that in *Johnson v. Snell* and *Sandel v. Burney*, Texas courts distinguished the purchase of property from the mortgage agreement used to make the purchase. *See generally Johnson v. Snell*, 504 S.W. 2d 397 (Tex. 1973); *Sandel v. Burney*, 714 S.W. 2d 40 (Tex. App.—San Antonio 1986, no writ). In *Johnson*, the court held that a contract for the sale of real property was enforceable even though the contract did not include the terms of the mortgage. *Johnson*, 504 S.W. at 399. *Johnson*, however, concerned when the *contract* for the sale of land was complete and enforceable. *See id*. ("The failure of the *contract* to provide the fundamental provisions of a deed of trust does not render the *contract* to sell property in itself incomplete and unenforceable." (emphases added)). It did not discuss when the *sale itself* is complete, nor did it analyze whether the purchase of real property is an ongoing transaction that is completed when the mortgage is satisfied.

12

The *Sandel* court held that a mortgage "creates only a lien and does not operate as a transfer of title." *See* 714 S.W. 2d at 41. Although the court distinguished between a mortgage and the transfer of title, it did not hold that possession of title alone is dispositive of a purchase. *Id.* As in *Johnson*, the court did not foreclose the possibility that the continued possession of the title could be made conditional on future mortgage payments. *Id.* This is not surprising because it is well established that the purchase of real property can be ongoing and not fully completed until the mortgage is satisfied. *See, e.g.*, *Dunlap v. Wright*, 11 Tex. 597, 603–04 (1854) ("If the purchase money be paid, if the mortgage be satisfied, the seizin will be regarded as having been in the vendee *ab initio*, or from the date of the purchase. If not paid, the vendor will . . . be reseized, free of the mortgage."). Thus, the cases cited by TLS are inapposite.

In summary, the disputed statutory provisions allow the State to take possession of charter school property purchased with state funds received after September 1, 2001. Tex. Educ. Code § 12.128(a)-(c). We construe the statutory term "purchase" to include mortgage payments. Based on the undisputed evidence that TLS used over $144,000 in state funds received after September 1, 2001, to make mortgage payments on the properties, we therefore conclude that TEA properly invoked Section 12.128 in this case.

**Constitutional Challenges**

Having rejected TLS's interpretation of the statute, we turn to its arguments that Section 12.128 is unconstitutional on its face and as applied.

13

*Facial Challenge*

TLS contends, "In no circumstance would it be constitutional to take the fee simple property, and pay nothing for it, simply because a landlord accepts rental payments from a charter school using [s]tate funds." But this Court has already rejected that argument, holding that Section 12.128(c) is not facially unconstitutional in allowing the State to seize property purchased with state funds. *See Texas Educ. Agency v. Academy of Careers & Techs., Inc.*, 499 S.W.3d 130, 135–36 (Tex. App.—Austin 2016, no pet.) (*ACT*). As we explained, "Because the state provides funds to charter schools to be used exclusively for a public purpose, there is nothing unconstitutional about its taking possession of property that the charter school purchases with those funds." *Id*. at 136. Thus, for the same reasons we rejected this challenge in *ACT*, we reject TLS's challenge here.

*As-Applied Challenge as a Physical Taking*

TLS asserts that TEA's actions, through the orders of the conservator, "equated to both a physical taking and a regulatory taking." According to TLS, it was a physical taking in that TEA "ordered the physical doors locked and no one [could] physically access the properties," and "[i]t was a regulatory taking as it deprived TLS of all reasonable access and use, as well as investment back expectations of the property." TLS contends that it would be an unconstitutional taking for the State to take possession of school property purchased with state funds unless the charter holders are provided just compensation for any private investment in the school property.

"Sovereign immunity from suit does not protect the State from a claim under the takings clause" of the Texas Constitution. *State v. Brownlow*, 319 S.W.3d 649, 652 (Tex. 2010) (citing *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007)). However, "if a plaintiff 'cannot

14

establish a viable takings claim' against a governmental entity, the claim would implicate immunity and potentially be barred by it." *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 514 (Tex. App.—Austin 2014, no pet.) (quoting *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013)). To establish a viable takings claim, the plaintiff must prove: (1) the State intentionally performed certain acts, (2) that resulted in a "taking" of property, (3) for public use. *General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

Here, TLS cannot show the requisite intent. "In a contractual arrangement, 'whenever the government acts within a color of right to take or withhold property, . . . the government cannot be said to have effected a taking because there was no intent to take, only an intent to act within the scope of the contract.'" *State v. Operating Contractors*, 985 S.W.2d 646, 651–52 (Tex. App.—Austin 1999, pet. denied) (quoting *Green Int'l, Inc. v. State*, 877 S.W.2d 428, 433 (Tex. App.—Austin 1994, writ dism'd)). Thus, "[t]he concept of taking as a compensable claim has limited application to the relative rights of the parties when those rights have been voluntarily created by contract." *City of Corpus Christi v. Acme Mech. Contractors*, 736 S.W.2d 894, 903–04 (Tex. App.—Austin 1987, writ denied). "When the government acts pursuant to colorable contract rights, it lacks the necessary intent to take under its eminent-domain powers and thus retains its immunity from suit." *Holland*, 221 S.W.3d at 643. "This is because the State may 'wear two hats: the State as a party to the contract and the State as sovereign.'" *Id*. (quoting *Little-Tex*, 39 S.W.3d at 599 (alteration of punctuation omitted)). "The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers." *Id*.

15

In this case, the charter contract expressly provides that its terms and conditions include "applicable law," thereby incorporating Section 12.128 of the Education Code into the contract. Although Section 12.128 did not exist at the time the parties entered into their first charter agreement, Section 12.1071 of the Education Code provides, "A charter holder who accepts state funds under Section 12.106 after the effective date of a provision of this subchapter agrees to be subject to that provision, regardless of the date on which the charter holder's charter was granted." Tex. Educ. Code § 12.1071. TLS accepted Section 12.106 funds after September 1, 2001, the effective date of Section 12.128. Moreover, TLS renewed its charter contract after the effective date of Section 12.128. Thus, the renewed contract also would have incorporated Section 12.128.

Additionally, paragraph 34 of the charter contract, titled "Charter School Facility," provides that the charter holder "shall have and maintain *throughout the term of the charter* a lease agreement, title or other legal instrument granting to Charter holder the right to occupy and use one or more facilities suitable for use as the charter school facilities described by the charter." (emphasis added). Thus, by the terms of the contract, TLS had the right to occupy or use the charter school facilities only "throughout the term of the charter," not after the charter was revoked. For these reasons, to the extent that TEA's actions deprived TLS of any possessory interest TLS might otherwise have had in the properties, TEA was acting in its capacity as a party to the charter agreement, not as a sovereign exercising its power of eminent domain. *See Holland*, 221 S.W.3d at 643–44; *Little-Tex*, 39 S.W.3d at 599. Accordingly, TEA's actions do not constitute a physical taking.

*As-Applied Challenge as a Regulatory Taking*

TLS argues that enforcement of Section 12.128 amounts to a regulatory taking. It is not. "A regulatory taking arises when the government imposes restrictions 'unreasonably interfer[ing] with landowners' rights to use and enjoy their property.'" *Hearts Bluff*, 381 S.W.3d at 489 (quoting *Mayhew*, 963 S.W.2d at 935). Here, TLS seeks to exercise a contractual right to physically take property, thus there is no regulation interfering with TLS' use to create a regulatory taking.

As discussed in the physical takings discussion above, TLS entered into a contract with the State of Texas to operate a charter school. The properties acquired by TLS existed for that purpose, and TLS used them for that purpose. The "regulatory regime" TLS complains of was Chapter 12, Subchapter D of the Education Code, which controls the physical allocation of property upon dissolution of charter schools such as the one that TLS operated. At the time TLS entered into the charter contract—which expressly incorporated "applicable law"—TLS was aware that its use of the property—and of state funds to purchase property—would be governed by that statutory framework. After the statute was amended in 2001 to include the provisions of Section 12.128, TLS used state money to purchase property, and consistent with the statutory framework, began listing the property as belonging to the State on its annual inventory statements. The contract clearly gave the charter holder the right to occupy or use the charter school facilities only "throughout the term of the charter." Under these circumstances, TLS could not have reasonably expected that its "right

17

to use and enjoy" the properties purchased with state funds would continue after its charter was revoked. *Hearts Bluff*, 381 S.W.3d at 489. Accordingly, we find no regulatory taking here.[3]

### As-Applied Challenge as Violation of Due Course of Law

TLS contends Section 12.128 violates its right to due course of law as an "unconstitutionally oppressive regulation," asking us to apply the standard set forth in *Patel v. Texas Department of Licensing & Regulation*, 469 S.W.3d 69 (Tex. 2015). Our state's constitution provides, "No citizen of this State shall be deprived of . . . property . . . except by the due course of the law of the land." Tex. Const. art. I, §19. The *Patel* court held that to prevail on a due-course challenge to economic regulation, a proponent must demonstrate "that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." *Patel*, 469 S.W.3d at 87.

*Patel* involved a challenge to occupational licensing regulations requiring cosmeticians providing threading services to undergo a minimum of 750 hours of training at their own expense. *Id*. at 73. To comply with the statute, the "threader trainees have to pay for the training and at the same time lose the opportunity to make money actively practicing their trade." *Id*. at 90. The court analyzed these requirements under our constitution's substantive-due-course

---

[3] Because we conclude, as a matter of law, that Section 12.128 did not effect a physical or regulatory taking, we need not address whether TLS was entitled to a takings-impact assessment. *See* Tex. Gov't Code § 2007.043; Tex. R. App. P. 47.1.

18

provisions, which, the court concluded, "were undoubtedly intended to bear at least some burden for protecting individual rights." *Id*. at 87. Ultimately, the court determined that the licensing regime imposed such an unreasonably oppressive burden on the threaders that it violated their right to due course of law. *Id*. at 90.

The *Patel* standard and the rights at issue therein are not an issue in the present dispute. The Supreme Court of Texas has made clear that its holdings in that case must remain "properly limited to the particular legal framework" in which they were made. *See Hegar v. Texas Small Tobacco Coal.*, 496 S.W.3d 778, 788 n.35 (Tex. 2016). And, as set out in the earlier discussion of TLS's takings claim, the statute at issue here does not erect an economic barrier of entry into a given profession. Section 12.128 does not inhibit an individual's ability to pursue economic or professional opportunity. It does not impair an individual's ability to obtain a charter and establish an open-enrollment charter school. Instead, the challenged statute "carefully circumscribes" the use of public funds, *LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W. 3d 73, 70 (Tex. 2011), to ensure "fiscal accountability," 2001 Tex. Gen. Laws at 5344 (codified at Tex. Educ. Code 12.001(b)). The law provides that state funds for charter schools are "held in trust . . . for the benefit of the students of the open-enrollment charter school," Tex. Educ. Code § 12.107(a)(2), and that property purchased with section 12.106 funds is considered the property of the State. In short, the "legal framework" at issue here does not implicate the concerns of *Patel,* but rather the rights and obligations of recipients of state funding. *See Hegar*, 496 S.W.3d at 788 n.35. TLS's reliance on *Patel* is therefore misplaced.

19

*Federal Claims*

Finally, to the extent TLS raised analogous takings and due-process claims under the United States Constitution in the district court, those claims were not briefed on appeal and are therefore waived. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655–56 (Tex. 2001). Regardless, Texas jurisprudence is consistent with federal jurisprudence with respect to constitutional claims, resulting in similar analysis and conclusions. *See, e.g.*, *Patel*, 469 S.W.3d at 86 ("Following the lead of our prior jurisprudence, we conclude that the Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution."); *Hearts Bluff*, 381 S.W.3d at 477 ("Our case law on takings under the Texas Constitution is consistent with federal jurisprudence.").

## CONCLUSION

On this record, TLS failed to establish the viability of any of its constitutional claims, and we reject its proposed statutory interpretation. Its ultra vires claim therefore fails as a matter of law, and its suit is barred by sovereign immunity. *See Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011); *Academy of Careers & Techs., Inc.*, 499 S.W.3d at 137. Accordingly, we affirm the district court's order sustaining TEA's plea to the jurisdiction and dismissing the case.

_____

Michael Toth, Justice

Before Chief Justice Rose, Justices Goodwin and Toth

Affirmed

Filed:   December 28, 2018

20